IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-30689

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES A. NORRIS, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Louisiana, Monroe

_____

June 26, 2000

Before KING, Chief Judge, GARWOOD and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant James A. Norris, Jr., (Norris) was convicted after a jury trial of four counts of making false declarations in violation of 18 U.S.C. § 1623, sentenced to thirty-three months' imprisonment and three years' supervised release, and ordered to pay $490,000 in restitution. Norris appeals his convictions and sentences, arguing that the district court erred by admitting a videotape re-creation and testimony by the government's expert witness, by ordering Norris to pay restitution, and by enhancing his sentence for substantial interference with the administration of justice. We agree with Norris

that the district court erred in ordering restitution, but reject his other attacks on his convictions and sentences. Accordingly, we affirm in part and reverse in part.

## Facts and Proceedings Below

In 1989, Norris served as the district attorney for Ouachita and Morehouse Parishes in Louisiana and was also a partner in the West Monroe law firm of Johnson & Placke. A dispute over business decisions arose between Norris and his law partners, culminating in June 1989 with Norris disbursing $500,000 from the law partnership's money market accounts. In August 1989, Norris's law partners filed a state civil suit against him, seeking restoration of the disbursed funds and additional damages.

On February 9, 1994, Norris withdrew $500,000 in cash–5,000 $100 bills--from his personal accounts at Louisiana National Bank and placed it in a bank safe deposit box. Nearly eight months later, on September 30, 1994, his former law partners obtained a judgment, awarding them $540,000 plus prejudgment interest, amounting in all to approximately $800,000, in their state action against him.[1] The next day, Norris withdrew all the cash, approximately $500,000, from his safe deposit

---

[1]Norris ultimately appealed, and on November 8, 1995 the judgment was affirmed by the Louisiana Court of Appeals for the Second Circuit, *Johnson & Placke v. Norris*, 665 So.2d 183 (table) (La. App. 2d Cir. 1995); the Louisiana Supreme Court on February 2, 1996 denied Norris's application for writs, *Johnson & Placke v. Norris*, 666 So.2d 1098 (La. 1996).

box.[2]

In December 1994, Norris's former law partners sought to execute on their judgment through state court proceedings. Norris testified at a judgment debtor examination that he had "spent" the money he had deposited in and subsequently removed from the safe deposit box, though he did not specify how he had spent the money. Attempting to collect on their judgment, Norris's former law partners filed an involuntary bankruptcy proceeding against him on January 30, 1995. On March 30, 1995, Norris testified under oath in an ancillary bankruptcy proceeding under Federal Bankruptcy Rule 2004, declaring under oath that on October 1, 1994 he had incinerated the some 4,900 $100 bills that he had withdrawn from the bank safe deposit box on October 1, 1994 by pouring gasoline on the money and burning it all in a metal trash barrel at his residence. On April 5, 1995, Norris appeared before the bankruptcy court for a hearing on his motion to dismiss the involuntary bankruptcy petition. At this hearing, Norris repeated under oath his previous statement about burning the cash. During another Rule 2004 ancillary bankruptcy proceeding held on May 1, 1995, Norris reiterated under oath that he had burned all the money. Norris also explained his use of the term "spent" at the December 1994 state judgment debtor examination as an attempt to convey that the money was "gone" or "burned."

Finally, on May 11, 1995, Norris testified before the bankruptcy

---

[2]According to Norris, he had previously withdrawn and spent between $5,000 and $10,000 of the money on living expenses.

court at a trial conducted pursuant to the bankruptcy trustee's motion for turnover, asking the court to order Norris to deliver certain assets to the trustee, including $500,000 that he withdrew from his bank safe deposit box.  At this trial, Norris repeated under oath his earlier statements that he no longer possessed the cash because he had burned it all in a trash barrel at his residence.  The bankruptcy court did not believe Norris's testimony and, on June 13, 1995, ordered him to turn over the cash to the bankruptcy trustee.  Norris refused.

On July 21, 1995, the bankruptcy court conducted a hearing on the trustee's motion for sanctions and civil contempt against Norris.  The bankruptcy court filed a report on August 14, 1995, holding Norris in contempt of court for failing to deliver the cash to the trustee and recommending that Norris be incarcerated until he turned over the cash. On January 31, 1996, a district court adopted the bankruptcy court's recommendation and held Norris in civil contempt, ordering him to be incarcerated until he produced the funds.  Norris appealed the contempt order to this Court, and we affirmed in an unpublished opinion.  *In re Norris*, No. 96-30146 (5th Cir. Apr. 11, 1997) (*per curiam*).  Every month during his incarceration, Norris was brought before the bankruptcy court and asked to reveal the location of the cash and thereby lift the contempt order.  On each occasion, Norris maintained that he had burned the money.  Norris remained imprisoned until March 19, 1997–the date of his arraignment for his instant perjury offenses.

On February 2, 1997, a grand jury returned an indictment charging

4

Norris with four counts of false declarations, all in violation of 18

U.S.C. § 1623[3], related to the four instances–March 30, April 5, May 1

---

[3]18 U.S.C. § 1623 states as follows:
"(a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.
　　(b) This section is applicable whether the conduct occurred within or without the United States.
　　(c) An indictment or information for violation of this section alleging that, in any proceedings before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if—
　　　　(1) each declaration was material to the point in question, and
　　　　(2) each declaration was made within the period of the statute of limitations for the offense charged under this section.
In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declarations material to the point in question in any proceeding before or ancillary to any court or grand jury. It shall be a defense to an indictment or information made pursuant to the first sentence of this subsection that the defendant at the time he made each declaration believed the declaration was true.
　　(d) Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.
　　(e) Proof beyond a reasonable doubt under this section

5

and May 11, 1994--during the bankruptcy proceedings in which he testified that he had burned approximately $490,000 in cash.  Norris then filed a motion to dismiss the indictment on the basis that the prosecution violated the Double Jeopardy Clause of the United States Constitution as he had already been punished for the offenses charged in the indictment by being incarcerated pursuant to the civil contempt order.  The district court denied Norris's motion to dismiss, and this Court affirmed in an unpublished opinion. *United States v. Norris*, No. 97-30812 (5th Cir. June 9, 1998), *cert. denied*, 119 S.Ct. 360 (1998).

The government sought to prove the perjury charges against Norris at trial, in part, through a videotape of, and testimony relating to, the Department of Alcohol, Tobacco, and Firearms (ATF) re-creation of the burning of the currency as Norris had described it in his declarations during his bankruptcy.  In particular, the government intended the re-creation to demonstrate that most of the cash could not have burned under Norris's description of the incident, thereby establishing that Norris did not in fact burn all or substantially all the currency as he had testified to under oath and before the bankruptcy court.

Before trial, Norris filed a motion in limine to exclude the re-enactment evidence by the government as irrelevant and prejudicial under

is sufficient for conviction.  It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence."

Federal Rules of Evidence 401,[4] 403,[5] and 703.[6]  The district court

conducted a hearing, after which it ruled that the re-enactment evidence

was provisionally admissible.  The charges against Norris proceeded to

trial in March 1999.  At trial, Norris filed another motion to exclude

the re-enactment videotape and testimony relating to it, this time on

the ground that this evidence was not reliable under *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 113 S.Ct. 2786 (1993).  The district court

overruled Norris's objection, reasoning that *Daubert*'s teachings did not

apply because *Daubert* only applied in determining whether an expert

would be qualified to testify.  The district court, however, concluded

that the ATF's re-enactment accurately represented the events as Norris

described them.  Accordingly, the district court determined that the

government's evidence was both reliable and relevant.

---

[4]Federal Rule of Evidence 401 states:
   "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[5]Federal Rule of Evidence 403 reads:
   "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[6]Federal Rule of Evidence 703 provides:
   "The facts or data in the particular case upon which an expert bases an opinion or inferences may be those perceived by or make known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

At trial, the government introduced over Norris's objections the re-enactment videotape and the testimony of ATF Agent Dennis Keith Constantino's (Agent Constantino). The district court permitted Agent Constantino to testify as an expert in fire investigation. Agent Constantino testified that he had re-enacted the steps Norris allegedly took when he burned the cash at his residence on October 1, 1994. Agent Constantino conducted the re-creation on February 4, 1997 at 11:30 a.m. in Gaithersburg, Maryland, at the Department of Commerce's National Institute for Standards and Technology. The Bureau of Engraving and Printing provided Agent Constantino with 4,950 uncirculated $5 bills, and he placed them in a five-gallon plastic container, as Norris claimed to have done. Agent Constantino then poured one and three-fourths gallons of gasoline into the plastic container. After the gasoline and the currency remained in the plastic container for approximately fifteen minutes, Agent Constantino tossed the contents of the plastic container into a brand-new fifty-five gallon steel trash barrel. The gasoline was then lit on fire with an electric match, and the currency and gasoline burned for five minutes. After the five minutes expired, Agent Constantino extinguished the fire by dumping the contents of a fifty-pound bag of corn feed, or deer corn, into the barrel, as Norris had stated he had done. Agent Constantino then allowed the barrel to cool for two to three minutes, before examining the barrel and its contents. First, he noticed that much of the interior paint on the barrel had burned off, which occurred within the first couple of minutes of the

8

fire.  Turning his attention to the currency, Agent Constantino observed that only about ten percent of the bills had been either damaged or destroyed.  After completing the re-enactment, Agent Constantino spent approximately twenty minutes burning the undamaged bills, as the Bureau of Engraving and Printing requested that all the currency be destroyed.

As Agent Constantino admitted, the re-creation was not an exact duplication of Norris's alleged burning of the currency.  First, the re-creation occurred in a different location at a different time of year–February in Maryland[7] as opposed to October in Louisiana.  Moreover, as a slight drizzle came down while gasoline was being poured on the currency in the plastic bucket, Agent Constantino performed the burning portion of the experiment under cover with a ten-foot ceiling, while Norris claimed to have burned the money without substantial cover.  Second, Agent Constantino used 4,950 $5 bills, and Norris stated that he burned approximately 4,950 $100 bills.  A $100 bill weighs approximately eight-to-nine percent less than a $5 bill.  In addition, although Norris's testimony does not reveal the wear of the bills he allegedly incinerated, Agent Constantino used newly-minted, uncirculated currency.  Third, the barrel used by Agent Constantino was a brand-new one, while Norris's was used and likely would have exhibited some wear and contained some residue material.[8]  Fourth, Agent Constantino ignited

---

[7]Agent Constantino testified that it was forty-seven degrees fahrenheit with a slight wind when he conducted the re-creation.

[8]Robert S. Arnold, a chemical laboratory manager at an engineering consulting firm, Engineering and Fire Investigations, testified that his

9

the re-creation with an electric match; in contrast, Norris asserted that he lit a kitchen match and tossed it into the barrel. Fifth, when placing the currency in the five-gallon plastic container, Agent Constantino stacked many of the bills, while Norris's statements were equivocal as to the portion of bills that were stacked as opposed to fanned out. Finally, Agent Constantino poured one-and-three-fourths gallons of gasoline. In Norris's various statements, the amount of gasoline ranges from one-half to one-and-three-fourths gallons. Agent Constantino chose the highest figure to provide for the maximum burn, thereby giving Norris the benefit of the doubt. In all instances in which Norris's testimony contained ambiguities or inconsistencies on a particular step in his alleged process of burning the currency, including the duration of the burn, Agent Constantino erred, if at all, in favor of a hotter, longer burn. Agent Constantino concluded that Norris's "recipe" could not have burned more than a small portion of the cash and that any variations in the re-creation resulted in only a "minimal" difference between the amount of currency burned in the re-enactment and the amount that would be burned under Norris's description.

Following a two-day trial, the jury convicted Norris on all four counts. Before sentencing, the Probation Office submitted its

---

analysis of the two barrels removed from Norris's residence revealed that, if there was a fire in either of them, it was of extremely short duration (less than 30 seconds) and was not intense enough to burn the paint on their exterior, thus further establishing that the burning of the currency could not have occurred as Norris testified it did.

Presentence Investigation Report (PSR) for Norris's sentencing. The PSR recommended that Norris should be ordered to pay approximately $490,000 in restitution to his former law partners and that Norris's offense level should be enhanced by three levels pursuant to U.S.S.G. § 2J1.3(b)(2) for substantial interference with the administration of justice. After reviewing the PSR, Norris objected to it arguing, *inter alia*, that his former law partners were not victims of his perjury offense and, therefore, were not entitled to restitution. Norris also asserted that his offense level should not be increased under U.S.S.G. § 2J1.3(b)(2), because his allegedly false statements did not substantially interfere with the administration of justice.

On June 18, 1999, after a sentencing hearing, the district court overruled Norris's objections. The district court concluded that Norris's former law partners were victims of his false statements and that Norris's perjury substantially interfered with the bankruptcy court's proceedings and caused additional expenditure of court resources in the contempt hearings. The district court sentenced Norris to thirty-three months' imprisonment[9], three years' supervised release, and

---

[9]The PSR calculated Norris's as follows. The base offense level was 12. *See* U.S.S.G. § 2J1.3(a). A three-level increase in the offense level was imposed because his offense resulted in substantial interference with the administration of justice. *See* U.S.S.G. § 2J1.3(b)(2). Because Norris committed 4 offenses of the same offense level, 4 offense levels were also added. *See* U.S.S.G. § 3D1.4. Accordingly, Norris's total offense level was 19, and his criminal history category was I, resulting in a guideline range of 30-37 months' imprisonment. *See* U.S.S.G. Ch. 5, Part A.

In the judgment of conviction, the district court adopted the PSR's

11

a special assessment of $400 and ordered him to pay $490,000 in restitution[10].   Norris now appeals.

## Discussion

On appeal, Norris asserts that the district court committed the following errors: (1) admitting the re-enactment video and Agent Constantino's testimony; (2) ordering him to pay restitution to his former law partners; and (3) increasing his offense level for substantial interference with the administration of justice under U.S.S.G. § 2J1.3(b)(2).  We address these issues in that order.

I    Admissibility of the Government's Evidence

Norris argues that the district court erred in admitting the videotape re-creation and Agent Constantino's testimony relating to the re-creation.  Norris contests neither the relevancy of the re-creation and Agent Constantino's testimony nor Agent Constantino's qualification as an expert in fire investigation.  Instead, Norris focuses on the reliability of the evidence, challenging the admission of the re-

---

factual determinations and guideline application, listing a total offense level of 19 and a criminal history category of I.  However, the district court noted a resulting guideline range of 27-33 months' imprisonment.  No party complains of this error, and we consider it merely to be typographical.  Moreover, the district court sentenced Norris to 33 months' imprisonment, which falls within the appropriate range of 30-37 months.

[10]Before his perjury trial, Norris settled the 1989 state civil action brought against him by his former law partners.  The district court correctly noted that 18 U.S.C. § 3664(j)(2) entitles Norris to a credit toward his restitution order of any funds he proves his former law partners receive under the settlement agreement. *See United States v. Shinebaum*, 136 F.3d 443, 449 (5th Cir. 1998), *cert. denied*, 119 S.Ct. 1808 (1999).

12

creation and Agent Constantino's testimony without requiring the establishment of a proper foundation under *Daubert*. The district court rejected Norris's objection to the evidence and concluded that *Daubert* did not apply to re-creation evidence. However, the district court, in deciding to admit the evidence, did find that the re-creation was "substantially similar" and thus was reliable and relevant.

We review the admission of expert evidence for abuse of discretion. *See Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 274 (5th Cir. 1998) (*en banc*), *cert. denied*, 119 S.Ct. 1454 (1999) (citing *General Elec. Co. v. Joiner*, 118 S.Ct. 512, 517 (1997)). In other words, "the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997) (internal quotations and citations omitted). If we find an abuse of discretion in admitting the evidence, we consider any error under the harmless error doctrine, affirming the judgment unless the ruling affected a substantial right of the complaining party. *See United States v. Haese*, 162 F.3d 359, 364 (5th Cir. 1998), *cert. denied*, 119 S.Ct. 1795 (1999) (citing *United States v. Skipper*, 74 F.3d 608, 612 (5th Cir. 1996)). We conclude that, although the district court erroneously determined that the principles of *Daubert* did not apply to the re-creation and Agent Constantino's testimony, the district court did not err in admitting the evidence.

Under *Daubert*, the district court conducts a "preliminary

13

assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 113 S.Ct. at 2796; *see* FED. R. EVID. 702[11]. This "gate-keeping" obligation on the part of the district court applies to all types of expert testimony, not just scientific testimony. *See Kuhmo Tire Co., Ltd. v. Carmichael*, 119 S.Ct. 1167, 1174 (1999) (holding that *Daubert*'s "basic gatekeeping obligation . . . applies to all expert testimony"). Many factors may bear on this inquiry, including whether a theory or technique can be or has been tested, has been subjected to peer review, has received general acceptance, and the technique's known or potential error rate *See Daubert*, 113 S.Ct. at 2796-97. *Daubert* makes clear that these four factors are non-exclusive and "do *not* constitute a 'definitive checklist or test.'" *Kuhmo*, 119 S.Ct. at 1175 (quoting *Daubert*, 113 S.Ct. at 2796). "[W]hether *Daubert*'s suggested indicia of reliability apply to any given testimony depends on the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony." *Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999). Regardless of the factors considered or

---

[11]Federal Rule of Evidence 702 states:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

14

the test employed, "the objective is to ensure the reliability and relevance of the expert testimony." *Tanner v. Westbrook*, 174 F.3d 542, 547 (5th Cir. 1999) (citations omitted). Moreover, we afford the district court "the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." *Kuhmo*, 119 S.Ct. at 1176.

As the Supreme Court explained in *Kuhmo*, *Daubert*'s gate-keeping obligation applies to all expert testimony, and the district court erred in concluding that the videotape re-creation and Agent Constantino's testimony about the re-creation did not trigger a *Daubert* inquiry. *See Robinson v. Missouri Pac. R.R. Co.*, 16 F.3d 1083, 1088-89 (10th Cir. 1994) (stating that a video re-creation of an accident by an expert witness and his testimony is subject to *Daubert*'s gate-keeping function). We find, however, that this error was substantially only in form or nomenclature, as the district court analyzed the reliability of the government's evidence, thus in substance essentially performing its gate-keeping role under *Daubert* and *Kuhmo*.

Norris argues that the re-creation and Agent Constantino's deductions from it should have been excluded, because there was no protocol followed during the re-creation, no theory or manuals were relied upon, no error rate was known, there was no independent validation of the re-creation, and the re-creation was only performed

15

once.  In the absence of these factors, Norris concludes that the re-creation cannot meet *Daubert*'s requirement for reliability.  However, "[t]he test of reliability is flexible and bends according to the particular circumstances of the testimony at issue." *Tanner*, 174 F.3d at 547.  The relevant issue is whether Agent Constantino could reliably draw a conclusion as to whether Norris's "recipe" would in fact cause all or substantially all the bills to burn up.  *See Kuhmo*, 119 S.Ct. at 1177.  In making this evaluation, Agent Constantino re-created the events as Norris described them in his testimony before the bankruptcy court.  Norris argued before the district court that the re-creation deviated from the alleged actual event in some respects: (1) the climate; (2) the use of $5, instead of $100, bills; (3) the placement of the currency in stacks, as opposed to fanned out; (4) the fact that the $5 bills were unused and freshly minted; and (5) the use of an electric match, instead of a kitchen match.  Despite these deviations, which Agent Constantino testified were minor, the district court admitted the evidence, finding that the re-creation was "substantially similar" to the alleged events as Norris described them–a standard this Court and other Courts of Appeals have consistently employed when considering evidence of this character.  *See Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1330-31 (5th Cir. 1996); *Williams v. Briggs Co.*, 62 F.3d 703, 707-08 (5th Cir. 1995); *Barnes v. General Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977); *see also McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1403-04 (8th Cir. 1994); *Fusco v. General Motors*

16

*Corp.*, 11 F.3d 259, 263-64 (1st Cir. 1993); *Four Corners Helicopters v. Turbomeca, S.A.*, 979 F.2d 1434, 1442 (10th Cir. 1992) (all holding that if an experiment purports to simulate actual events, it will be admissible if made under conditions similar to those that are the subject of the litigation). "As a general rule, the district court has wide discretion to admit evidence of experiments conducted under substantially similar conditions." *Barnes*, 547 F.2d at 277. Agent Constantino used approximately the same number of bills, amount of fuel, and type of containers Norris allegedly used. In addition, Agent Constantino soaked the bills in the gasoline and allowed the fire to continue for at least the same period of time as Norris claimed he did. Agent Constantino also extinguished the fire with the same amount of deer corn. Moreover, some of the variations resulted from inconsistencies in Norris's various statements before the bankruptcy court, and Agent Constantino consistently chose among these variations in favor of a longer, hotter burn, thereby giving Norris the benefit of any variation. Therefore, we conclude that the district court did not abuse its discretion in determining that the re-creation was "substantially similar," as the conditions need not be precisely reproduced, but they must only be so nearly the same as to provide a fair comparison.

By making a finding of "substantial similarity," the district court effectively conducted a *Daubert* inquiry by ensuring that the evidence was relevant and reliable, despite not expressly addressing the four

17

non-exclusive factors listed in *Daubert* or those suggested by Norris. *Daubert*'s list of factors "neither necessarily nor exclusively applies to all experts or in every case." *Kuhmo*, 119 S.Ct. at 1171. Moreover, we note that Norris presented no evidence, expert or otherwise, indicating either that Norris could have burned all or substantially all the currency as he had described doing it or that had the reenactment not involved the above noted differences from Norris's description of what he did it might well have resulted in burning up substantially all of the currency. While Norris's expert did comment on the differences–e.g., that lighter bills would burn faster than heavier ones, as would "fanned" rather than "stacked" bills–he made no attempt whatever to even estimate the approximate extent to which those differences would influence the ultimate result. Nor did he ever opine either that the reenactment was unreliable as evidence that Norris's version of the events would not have resulted in burning up most of the currency or that Norris's version of the events likely would have burned up most of the currency. Norris's own testimony at trial was not to the contrary. Indeed, on direct examination Norris testified that "after seeing" the video of the reenactment he realized that "there may have been some unburned money in there [the 55 gallon can] that . . . [he] didn't see" but that he "didn't think it was at the time." This was the central theme of the defense at trial, from opening statement through closing argument–namely that whether or not substantially all the

18

currency had burned Norris honestly thought it had at the time.[12]

Although the district court erroneously stated that *Daubert*'s teachings did not apply to the videotape re-creation and Agent Constantino's testimony, under the circumstances of this case the district court did not abuse its discretion in admitting the evidence, because it in substance conducted an inquiry into the relevancy and reliability of the evidence.  Therefore, Norris's challenge fails.

II   Restitution

Norris next argues that the district court erred in finding that his former law partners were victims of his perjury offenses and thus ordering him to pay them $490,000 in restitution.  Norris asserts that false statements in judicial proceedings generally do not cause economic losses and that the losses sustained by his former law partners are not traceable to his perjured statements.  We agree and vacate the order of

_____

[12]Norris's testimony was that the burn lasted about 30 seconds to one or two minutes, he then poured the 50 pounds of deer corn in the barrel, which extinguished the fire, looked in the barrel, could see nothing but corn despite the use of a shovel, and then gently set the barrel on its side, looked in and still could see nothing other than deer corn, none of which (nor anything else) had come out of the barrel. His testimony noted that his setting the barrel down gently on its side, with none of its contents spilled, was different from the reenactment in which the barrel, after the fire was extinguished, was dropped the last some 18 inches in the process of being put on its side and was handled so as to empty onto the ground all the deer corn and unburned money.  Norris's expert testified that this "was the greatest difference" between the reenactment and Norris's description of the events and "was a dramatic, dramatic difference."  The expert also testified to the effect that currency soaked in gasoline might tend to stick to the bottom of the barrel.  Norris testified that after he set the barrel upright again he did not subsequently look in it before his private garbage service emptied the barrel during the following week in the course of their normal operations.

restitution.

"We review the legality of the district court's order of restitution de novo." *United States v. Hughey*, 147 F.3d 423, 436 (5th Cir.), *cert. denied*, 119 S.Ct. 569 (1998) (citing *United States v. Chaney*, 964 F.2d 437, 451 (5th Cir. 1992)). "Once we have determined that an award of restitution is permitted by the appropriate law, we review the propriety of a particular award for an abuse of discretion." *Id.*

In considering whether the district court erred in ordering restitution, we must determine whether Norris's former law partners were victims of Norris's perjury under 18 U.S.C. § 3663. Section 3663(a)(1)(B)(ii)(2) provides that:

> "the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(a)(1)(B)(ii)(2).

As a scheme, conspiracy, or pattern of criminal activity is not an element of Norris's perjury offenses, his former law partners must have been "directly and proximately harmed as a result of" his perjury for the order of restitution to be proper. *See United States v. Glinsey*, 209 F.3d 386, 394 (5th Cir. 2000) ("Under 18 U.S.C. § 3663(a)(1)(A), a sentencing court may order restitution if . . . a loss was sustained by the victim as a result of an offense."); *see also United States v. Henoud*, 81 F.3d 484, 488 (4th Cir. 1996) ("A proper restitution award

20

must be limited to the losses caused by the specific conduct of which the defendant is convicted."). We conclude that Norris's former law partners suffered no losses as a result of Norris's false statements before the bankruptcy court and, therefore, vacate the restitution order.

The purpose of a restitution order is to put the victim "in the same position as if the illegal activity had not occurred." *United States v. Campbell*, 106 F.3d 64, 70 (5th Cir. 1997). Norris's statements that he burned the currency did not place his former law partners in any worse position than if he had not made them, because no evidence suggests that the bankruptcy trustee, Norris's former law partners, the bankruptcy court, or the authorities, actually believed Norris's claim that he incinerated approximately $490,000 in cash. In fact, it is plain that the opposite is true. Shortly after Norris made these statements, the bankruptcy trustee filed motions for turnover, sanctions, and civil contempt against Norris to pressure him into revealing the truth about what happened to the money. Norris's former law partners, as creditors in the bankruptcy proceeding, supported the trustee's motions, and the bankruptcy court ruled in favor of the trustee on each of the motions. The bankruptcy court explicitly found that Norris had fabricated his story of burning the currency. No party before the bankruptcy court, including Norris's former law partners, detrimentally relied on this information. Norris's assertions that he burned the cash therefore did not cause any losses. Our holding does

21

not foreclose the possibility of imposing restitution for losses sustained by a victim of perjury; we simply find no basis for on it on the record before us. *See United States v. Broughton*, 71 F.3d 1143, 1148 & n.3 (4th Cir. 1995) (reversing restitution order against a defendant convicted of perjury before a grand jury where the perjury was intended to conceal the defendant's previously committed fraudulent business conduct, though recognizing the possibility of a restitution order to a victim of perjury).[13]

We conclude that Norris's former law partners were not victims of Norris's perjury, as they suffered no loss resulting from his false statements during the bankruptcy proceedings. Accordingly, we reverse and vacate the district court's restitution order. *See Campbell*, 106 F.3d at 70 (reversing and vacating a restitution order, without a remand to the district court).

III  Application of U.S.S.G. § 2J1.3(b)(2)

---

[13]In support of its position that the district court's restitution order was proper, the government cites *United States v. Pepper*, 51 F.3d 469 (5th Cir. 1995). Pepper had defrauded numerous persons in an investment scheme and then filed a petition for bankruptcy from which he received a discharge. *See id*. at 471. Pepper's dischargeable debts included at least thirteen loans that investors had made to him. Pepper was later indicted and convicted on numerous counts of mail and wire fraud, and the district court ordered Pepper to pay $155,560 in restitution to the victims of his fraud. Unlike the present appeal, Pepper did not contend that his investors were not victims of his fraudulent activities. Instead, Pepper argued that the district court could not order restitution because the debts of some of his victims were discharged in bankruptcy. *See id*. at 473. We disagreed, concluding that "Pepper's bankruptcy discharge does nothing to relieve the loss suffered by the victims of his scheme." *Id*. at 474. Our holding in *Pepper* does not resolve the issue presented by Norris.

22

Norris contends that the district court erred in increasing his offense level by three levels pursuant to section 2J1.3(b)(2), which provides for an enhanced sentence if the defendant's offense substantially interfered with the administration of justice. Norris does not contest the district court's finding that substantial resources were actually expended. Instead, Norris argues that the enhancement does not apply to his offense, because it is intended to apply only to a perjury offense causing increased costs in the investigation and prosecution of another offense, not the instant perjury conviction. Norris therefore asserts that, as there was no offense other than his false declarations, the enhancement cannot apply. We are unpersuaded by Norris's contention that he is ineligible for the enhancement, as his argument overlooks the damage his perjury inflicted on the proceedings before the bankruptcy court which we hold constitutes a sufficient basis for applying the enhancement.

We review the district court's application of the sentencing guidelines *de novo* and its findings of fact for clear error. *See United States v. Harrington*, 82 F.3d 83, 86 (5th Cir. 1996). We afford due deference to the district court's application of the guidelines to the facts. *See id.* Section 2J1.3(b)(2) provides that "[i]f the perjury, subornation of perjury, or witness bribery resulted in substantial interference with the administration of justice, increase by 3 levels." U.S.S.G. § 2J1.3(b)(2). Application note 1 to section 2J1.3 explains:

"'Substantial interference with the administration of

23

justice' includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.3, Application Note 1.

"The government need not particularize a specific number of hours expended by government employees" to sustain the application of section 2J1.3(b)(2)'s enhancement. *United States v. Jones*, 900 F.2d 512, 522 (2d Cir. 1992); *see United States v. Tackett*, 193 F.3d 880, 887 (6th Cir. 1999); *United States v. Sinclair*, 109 F.3d 1527, 1540 (10th Cir. 1997). Several Courts of Appeals have held that the expenses associated with the underlying perjury offense should not form the sole basis for an enhanced sentence under section 2J1.3(b)(2). *See Sinclair*, 109 F.3d at 1539; *United States v. Duran*, 41 F.3d 540, 546 (9th Cir. 1994); *Jones*, 900 F.2d at 522 (all holding that section 2J1.3(b)(2)'s enhancement does not apply when the government fails to identify any expenses in addition to the costs of bringing the defendant to trial for the perjury offense). We agree and conclude that the expenses incurred with the investigation and prosecution of Norris's instant perjury offenses may not form the sole basis for applying section 2J1.3(b)(2)'s enhancement. Otherwise, every perjury conviction would carry this enhancement. However, the district court's decision to apply the enhancement to Norris's offense level was not predicated solely on the expenditure of government and court resources in prosecuting him for perjury.

The PSR and the Probation Office's response to Norris's objections to the PSR, in supporting the application of section 2J1.3(b)(2)'s three-level enhancement, rely on his indictment and conviction for perjury *and* on the effect his perjury had on "the Bankruptcy Court's ability to administer justice as required on behalf of rightful creditors from whom [Norris] wrongfully withheld assets." In reviewing the latter ground for the enhancement's application, we must consider whether the unnecessary expenditure of substantial government or court resources in the bankruptcy context may trigger section 2J1.3(b)(2)'s enhancement and whether Norris's false declarations before the bankruptcy court caused the unnecessary expenditure of government or court resources.

The application of section 2J1.3(b)(2)'s enhancement for false declarations causing the expenditure of resources in a bankruptcy proceeding presents an issue of first impression in this Court. Neither section 2J1.3's language nor its commentary distinguishes between perjury in the criminal context and perjury in civil or bankruptcy proceedings. *See United States v. Holland*, 22 F.3d 1040, 1046-48 & n.11 (11th Cir. 1994) (holding that the sentencing guideline governing perjury cases, section 2J1.3, applies to perjury committed in civil, as well as criminal, proceedings). Other courts have held that a defendant convicted for perjury committed in a non-criminal proceeding may be eligible for enhanced sentencing under section 2J1.3(b)(2)'s provisions. *See United States v. Weissman*, 195 F.3d 96, 98-100 (2d Cir. 1999) (*per*

*curiam*) (considering the additional time spent by the Permanent Subcommittee of the United States Senate Committee of Governmental Affairs as a basis for section 2J1.3(b)(2)'s enhancement); *United States v. Kocsak*, 1997 WL 610457, at *3 (N.D. Ill. Sept. 19, 1997) (applying section 2J1.3(b)(2)'s three-level enhancement when the defendant committed perjury in a civil lawsuit); *see also United States v. Kaster*, 139 F.3d 902 (table), 1998 WL 78995, at **2 (7th Cir. Feb. 19, 1998) (*per curiam*) (unpublished opinion) (noting, without reviewing, the defendant's receiving an enhanced sentence under section 2J1.3(b)(2) for substantial interference with the administration of justice based on his false declaration before a bankruptcy court). We agree, concluding that perjury impeding the administration of justice in non-criminal proceedings may trigger section 2J1.3(b)(2)'s enhancement. *See Holland*, 22 F.3d at 1047 ("Perjury, regardless of the setting, is a serious offense that results in incalculable harm to the functioning and integrity of the legal system as well as to private individuals.").

We now address whether Norris's false declarations caused the unnecessary expenditure of substantial governmental or court resources. The Sentencing Guidelines do not define the term "substantial." However, Norris was the primary figure in resolving the involuntary bankruptcy proceeding filed against him, and his false statements under oath interfered with the bankruptcy court's ability to adjudicate his creditors' claims and dispose of his assets. His perjury also resulted in the bankruptcy trustee's filing motions for turnover, sanctions, and

26

civil contempt in order to amass Norris's assets for the benefit of his creditors. In addition, the bankruptcy court held hearings on many of these motions and ultimately incarcerated Norris. Moreover, the court brought Norris before it on a monthly basis to request that he state what actually happened to the money he claimed to have burned. In applying section 2J1.3(b)(2)'s enhancement for substantial interference with the administration of justice, the Sixth Circuit noted that "if a person is the only source of important information, [the] active concealment of this information will almost certainly change the course of the proceedings, making the investigation more difficult and costly, and hampering the truth-seeking function of government agents." *Tackett*, 193 F.3d at 887. Other courts agree with this proposition. *See Sinclair*, 109 F.3d at 1539-40; *United States v. Bradach*, 949 F.2d 1461, 1463 (7th Cir. 1991); *Jones*, 900 F.2d at 522. "Accordingly, where a defendant actively conceals important evidence of which [he or] she is the only source, a court may infer that the defendant's interference with the administration of justice was substantial." *Tackett*, 193 F.3d at 887. Because only Norris knew what actually happened to the currency he alleged to have incinerated, his false declarations fall within this category where substantial interference may be inferred.

The district court's findings also support the application of the enhancement. In considering Norris's objection to the application of section 2J1.3(b)(2)'s enhancement at the sentencing hearing, the district court expressly found that Norris's false declarations caused

27

the unnecessary expenditure of governmental and court resources during his involuntary bankruptcy proceedings.[14] Moreover, the district court, at the sentencing hearing and in its judgment of conviction, specifically referenced the PSR, which "'generally bears sufficient indicia of reliability to be construed as evidence by the trial judge in making the factual determinations required by the sentencing guidelines.'" *United States v. Sanders*, 942 F.2d 894, 898 (5th Cir. 1991) (quoting *United States v. Alaro*, 919 F.2d 962, 966 (5th Cir. 1990)). Because Norris has not established that the district court's finding that his perjury caused the unnecessary expenditure of substantial governmental or court resources is clearly erroneous, his claim fails.

## Conclusion

For the foregoing reasons, we reverse and vacate the district court's restitution order, and affirm Norris's convictions and sentences in all other respects.

AFFIRMED IN PART; REVERSED AND VACATED IN PART.

---

[14]At Norris's sentencing hearing, the district court stated: "As to your objection number two, you emphasized the objection as cost. I, frankly when I read the presentence report, before I read the thing I never thought in terms of money. I thought of the fact that there was substantial interference with the administration of justice through the bankruptcy courts, as well as requiring monthly appearances during the time he was in jail for civil contempt."

28