874 So.2d 340 (2004)
JOHNSON & PLACKE, et al, Plaintiffs-Respondents
v.
James A. NORRIS, Jr., Defendant-Applicant.
No. 38,300-CW.
Court of Appeal of Louisiana, Second Circuit.
May 12, 2004.
*342 T.J. Adkins, for Applicant.
Cook, Yancey, King & Galloway, by Bernard S. Johnson, Shreveport, for Respondents.
Before CARAWAY, PEATROSS and LOLLEY, JJ.
CARAWAY, J.
This unusual case requires examination of the use of the court's contempt power against a judgment debtor for his refusal to turn over possession of property subject *343 to seizure by the plaintiff. Following an initial finding of contempt by the district court in 1994 for the judgment debtor's failure to turn over 5,000 one-hundred-dollar bills, the debtor's bankruptcy intervened, staying the state court proceedings. In the bankruptcy court, the debtor continued his refusal to turn over the money claiming that he burned the cash. He was imprisoned by the bankruptcy court for civil contempt and also convicted by the federal government for perjury. The bankruptcy now having concluded without the discharge of the judgment debt, the plaintiff seeks to enforce the 1994 contempt order. Following a hearing to reconsider its original 1994 sentence for civil contempt, the trial court ordered the judgment debtor to jail, prompting our grant of supervisory review. Finding that the trial court's reconsideration of the civil contempt reflected a misapprehension of the limits of such contempt power, we now remand the case for further proceedings consistent with principles set forth herein.

Facts and Procedural History
Many facts surrounding this longstanding dispute have been reviewed in prior decisions of both this court and the federal courts. The controversy centers upon a money judgment of approximately $490,000 rendered on October 5, 1994, in favor of the appellee law firm, Johnson & Placke ("J & P") and its partners, against its former partner, James A. Norris, Jr. The judgment resulted from a successful action for conversion in which Norris was shown to have taken, without partnership authority, $525,977.81 in partnership funds. He used the funds to pay off approximately $330,000 of the partnership's debt, pocketing the remainder of the money as his asserted one-third share of the partnership. The trial court's award of approximately $460,000 to the partnership and $30,000 in emotional damages to Johnson and Placke, individually, for the conversion was later affirmed in an unpublished opinion of this court.
The judgment was not suspensively appealed. Therefore, the second round of proceedings seeking execution of the judgment began in December 1994, and resulted in a contempt of court judgment for Norris' failure to turn over cash shown to be in his possession. This aspect of the lawsuit remains highly relevant to this appeal, and is discussed in further detail below.
Before Norris served any jail time for the district court's judgment of contempt, the next phase began in bankruptcy court when J & P instituted an involuntary proceeding against Norris in January 1995. Upon the bankruptcy trustee's motion for turnover, the bankruptcy court ordered Norris to relinquish $490,000 to $500,000 in currency. The court rejected Norris' testimony that he burned the money in October 1994. In re Norris, 183 B.R. 437 (Bankr.W.D.La.1995). When Norris failed to comply with the bankruptcy court's order, it found him in contempt and ordered him imprisoned, subject to his ability to purge himself of the contempt by the payment of $490,000 to $500,000. In re Norris, 192 B.R. 863 (Bankr.W.D.La.1995), affirmed in Matter of Norris, 114 F.3d 1182 (5th Cir.1997), cert. denied, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997). The record indicates that Norris ultimately served one year in prison pursuant to the civil contempt order of the bankruptcy court.
The final proceeding which arose in connection with Norris' alleged burning of the currency was his prosecution for the perjury he committed before the bankruptcy court. United States v. Norris, 217 F.3d 262 (5th Cir.2000). In that case, the government disproved Norris' contention that he incinerated some 4,900 one-hundred-dollar *344 bills in a trash barrel by igniting the gasoline-soaked money. He was convicted and sentenced to 33 months imprisonment.
The initial state court proceeding for execution of J & P's judgment began on December 8, 1994, when the parties appeared in court on motions for protective order and contempt.[1] At the hearing, the firm also filed a motion pursuant to La. R.S. 13:3862 for an order directing the sheriff to serve Norris immediately and compelling Norris to surrender all currency in his possession, on his person or otherwise under his control.
At the December 8, 1994 hearing, Norris testified that in the first quarter of 1994, he placed approximately $500,000 in his safety deposit box at Louisiana Bank. Norris conceded that upon the trial court's rendition of its reasons for judgment in favor of J & P on September 30, 1994, he removed the funds from the safety deposit box in early October 1994. When asked what he did with the money next, Norris asserted his privilege against self-incrimination and refused to answer. However, Norris testified that the funds were not under his control at the time of the hearing. Nevertheless, the trial court determined that Norris' testimony failed to satisfy his burden of proving that the money was not in his possession. The court was particularly persuaded by the fact that Norris removed the money from the safety deposit box in October 1994, only two months prior to the hearing. Accordingly, the court signed the order directing Norris to deliver the money to the sheriff by 5:00 p.m. on December 9, 1994. The court informed Norris that non-compliance would expose him to contempt proceedings.
On December 14, 1994, J & P filed motions for a judgment debtor rule and for "Punishment for Failure to Comply with La. R.S. 13:3862" based upon Norris' failure to comply with the "turnover" order. The hearing was held on December 16, 1994. As in the previous proceedings, Norris represented himself. The trial court declined to hear further evidence at the contempt hearing about Norris' possession of the money, finding instead that those facts had already been established. Norris testified, again insisting that he could not produce the money, but he offered no other explanation, and instead claimed his privilege against self-incrimination. He also stated that in exchange for immunity, he would explain what he did with the money. J & P offered Norris' deposition into evidence, attempting to show that Norris borrowed money from his family in 1994 and pre-paid his home mortgage to avoid the court's judgment. Norris also claimed in his deposition that he took the money out of his safety deposit box and spent it. When asked how, he testified that he would have to go "back and look at records."
The trial court found Norris in contempt of court pursuant to La. R.S. 13:3862. The trial court also found Norris in direct contempt of court for failure to answer its question concerning the disposition of the money. The court then ordered Norris to jail pending such further orders of the court, and noted that the contempt could be purged if Norris solved the half-million-dollar problem.
*345 Norris first sought supervisory review from this court, which denied relief. Norris then pursued writs to the Louisiana Supreme Court which stayed further action pending resolution of the bankruptcy. It was not until June 20, 2003, that the Supreme Court recalled the stay order, denied Norris' writ application, and remanded the matter to the trial court.
Thereafter, on its own motion, the trial court set a rule to show cause why Norris should not begin serving the 1994 sentence for contempt. This hearing, which occurred on October 17, 2003, is the subject of this appeal. Norris filed preliminary exceptions of lack of jurisdiction and res judicata, arguing that because the bankruptcy court retained jurisdiction over the funds, the district court had none and that the identical turnover and contempt issues had already been adjudicated in the bankruptcy court. Finally, Norris argued that under the circumstances, the sentence's execution would be punitive rather than coercive. Attached to the exceptions were copies of the bankruptcy court's corresponding "turnover" order and another order stating that "any order authorizing the closing of this case shall not constitute or effectuate abandonment to the debtor of the bankruptcy estate's interest in, to or upon" the subject $500,000.
At the hearing on the rule, the trial court heard arguments, considered the briefs and denied the exceptions. Regarding the self-incrimination contempt sentence, the trial court noted that Norris had in fact answered the question about what he did with the money and spent time in jail for his answer. Nevertheless, as for Norris' failure to produce the money, the court stated that it did not "have any choice" on whether Norris went to jail because he had yet served no time for the 1994 contempt. The court had "its doubts" that new incarceration would have its "intended effect," but enforced the previous sentence anyway, and ordered Norris to report to jail the following Monday, pending supervisory review of this court. Although the court mentioned periodic review of Norris' case, it declined to set a schedule therefor. Norris' civil writ application ensued, resulting in our stay of the sentence and this review.
On appeal, Norris reiterates his claims of res judicata and lack of jurisdiction and argues that the trial court abused its discretion in imposing a punitive sentence for civil contempt. Specifically, Norris complains that the bankruptcy court's order expressly retained jurisdiction of the subject $500,000 and explicitly precluded abandonment of the interest of the bankruptcy estate in the money. Norris argues that this order effectively included the money as an asset over which the district court has no jurisdiction. Norris also contends that because identical issues were resolved in federal court, the present contempt proceedings are res judicata. Finally, in light of Norris' confinement and obvious inability to turn over the money, any further incarceration for civil contempt is punitive in nature.

Civil Contempt Sanctions
Subtle factual and remedial variances hinge contempt proceedings precariously between the civil and criminal law. When the contempt swings toward criminal punishment, the full panoply of constitutional rights protects the contemnor. Thus, as stated in Hicks on Behalf of Feiock v. Feiock, 485 U.S. 624, 630, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988), "the characterization of this proceeding and the relief given as civil or criminal in nature, for purposes of determining the proper applicability of federal constitutional protections, raises a question of federal law rather than state law." Accordingly, the United States Supreme Court's pronouncements on the law *346 of contempt are important guides for the consideration of this unusual contempt action.
Criminal contempt is a crime in the ordinary sense. As such, criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings. International Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). In Louisiana, the maximum sentences for criminal contempt are set forth in La. R.S. 13:4611(1)(a), (b) and (d).
In contrast, civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. International Union, 512 U.S. at 827, 114 S.Ct. 2552. Neither a jury trial nor proof beyond a reasonable doubt is required. Id. at 827, 114 S.Ct. 2552. Louisiana law provides that when a contempt of court consists of the omission to perform an act which is yet within the power of the person charged with contempt to perform, he may be imprisoned until he performs it. La. C.C.P. art. 226; La. R.S. 13:4611(1)(c).
Although the procedural contours of the two forms of contempt are well established, the distinguishing characteristics of civil versus criminal contempts are somewhat less clear. International Union, 512 U.S. at 827, 114 S.Ct. 2552. Most contempt sanctions share punitive and coercive characteristics, and the fundamental question underlying the distinction between civil and criminal contempts is what process is due for the imposition of any particular contempt sanction. Id. at 827, 114 S.Ct. 2552. Whether a contempt is civil or criminal turns on the character and purpose of the sanction involved. A contempt sanction is considered civil if it is remedial and for the benefit of the complainant. On the contrary, a contempt sanction is criminal if the sentence is punitive, to vindicate the authority of the court. The stated purpose of a contempt sanction alone, however, cannot be determinative. Rather, conclusions about the civil or criminal nature of a contempt sanction are properly drawn from an examination of the character of the relief itself. Id. at 827, 828, 114 S.Ct. 2552.
The paradigmatic coercive, civil contempt sanction involves confining a contemnor indefinitely until he complies with an affirmative command such as an order to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance. International Union, 512 U.S. at 828, 114 S.Ct. 2552; Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911). Imprisonment for a fixed term similarly is coercive when the contemnor is given the option of early release if he complies. International Union, 512 U.S. at 828, 114 S.Ct. 2552; Shillitani v. United States, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). In this situation, the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus "carries the keys of his prison in his own pocket." International Union, 512 U.S. at 828, 114 S.Ct. 2552; Gompers, 221 U.S. at 442, 31 S.Ct. 492. In contrast, a fixed sentence of imprisonment is punitive and criminal if it is imposed retrospectively for a completed act of disobedience such that the contemnor cannot avoid or abbreviate the confinement through later compliancethe defendant is furnished no key and he cannot shorten his term by promising not to repeat the offense.
*347 To jail one for contempt for omitting an act he is powerless to perform makes the proceeding purely punitive. Maggio v. Zeitz, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948). When compliance is impossible, neither the moving party, nor the court has any reason to proceed with the civil contempt action. United States v. Rylander, 460 U.S. 752, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983).
Likewise, the law is well established that a contemnor will not be held in jail forever for civil contempt. Maggio, 333 U.S. at 76, 68 S.Ct. 401. In fact, it is abhorrent to our concept of personal freedom that the process of civil contempt can be used to jail a person indefinitely, possibly for life, even though he or she refuses to comply with a court's order. In re Grand Jury Investigation, 600 F.2d 420 (3rd Cir.1979). Once confinement ceases to have any coercive impact, continued imprisonment for civil contempt constitutes a violation of due process. Lambert v. State of Montana, 545 F.2d 87 (9th Cir.1976).
For example, in the case of an adamant grand jury witness contemnor, continued imprisonment may reach a point where the imprisonment becomes more punitive than coercive, thereby defeating the purpose of the commitment. This occurs when it becomes obvious that sanctions are not going to compel compliance. Simkin v. United States, 715 F.2d 34 (2d Cir.1983); In re Grand Jury Investigation, 600 F.2d at 424-425. Federal district courts are given broad discretion in making this determination regarding adamant grand jury witnesses and are required to conscientiously determine on an individualized basis "whether there remains a realistic possibility that continued confinement might cause the contemnor to testify." Simkin, 715 F.2d at 37. Application of the due process standard to specific situations remains difficult, however, since the objectively identifiable facts such as age, state of health, and length of imprisonment will often fail to provide a clear indication of whether or not further confinement will increase the likelihood that the contemnor will accede to the court's demands. In re Grand Jury Investigation, 600 F.2d at 425. Likewise, a recalcitrant witness jailed for sixteen months, all the while refusing to furnish unprivileged information in state court proceedings, was entitled to a hearing to determine whether at some point in what otherwise would be an indefinite period of confinement, due process considerations obliged the court to release the contemnor if he could show no substantial likelihood that continued confinement would accomplish its coercive purpose. Lambert, 545 F.2d at 91. However, the mere refusal to comply, when a contemnor has not shown an inability to comply with a court order, has been held insufficient to show that a coercive order has lost its coercive effect even after the contemnor has served seven years in prison. Chadwick v. Janecka, 312 F.3d 597 (3rd Cir.2002), cert. denied, 538 U.S. 1000, 123 S.Ct. 1914, 155 L.Ed.2d 828 (2003). Likewise, the twelve-month refusal of a father to bring his young son to a hearing without consideration of other factors was held insufficient to show that the punishment had become punitive. King v. Department of Social and Health Services, 110 Wash.2d 793, 756 P.2d 1303 (1988). Still other courts have noted that each passing month of incarceration strengthens a claim of inability and that the steadfast refusal of an contemnor to yield to the coercion of incarceration, despite an ability to pay, would obligate a judge to release him after the passing of months or years. United States ex rel. Thorn v. Jenkins, 760 F.2d 736 (7th Cir.1985).
In Louisiana, contempt of court is generally defined as any act or omission tending to obstruct or interfere with the orderly *348 administration of justice, or to impair the dignity of the court or respect for its authority. La. C.C.P. art. 221. Acts constituting contempt include contumacious, insolent or disorderly behavior toward a judge, attorney or other officer of the court, general breaches of the peace, boisterous conduct or violent disturbances tending to interrupt the business of the court or impair its dignity or respect for its authority. La. C.C.P. art. 222. Additionally, our law provides that contempt occurs upon the wilful disobedience of any lawful judgment, order, mandate, writ, or process of the court or deceit or abuse of the process or procedure of the court by a party to an action or proceeding. La. C.C.P. art. 224. Contemptuous acts also include the removal of property in the custody of an officer acting under authority of a judgment, order, mandate, writ, or process of the court. La. C.C.P. art. 224.
A specific contempt provision is found in Louisiana's judgment debtor examination law. La. C.C.P. art. 2456 allows contempt punishment upon a judgment debtor who refuses to appear for the examination, to produce his books, papers, or other documents when ordered to do so or refuses to answer any question held pertinent by the court. A similar statute with a similar goal is La. R.S. 13:3862, which was also the basis of J & P's action in this case. Specifically, the statute provides as follows:
On ex parte motion of a party who has caused to be issued a writ directing the seizure of property, the court may order that money or other property on the person of the party against whom the order is directed, or otherwise in his possession or under his control, be delivered to the sheriff immediately upon personal service of the order.
If it is proved that at the time of such service the person ordered to deliver the money or other property had it on his person, or otherwise in his possession or under his control, the failure to comply with the order shall be punished as a contempt of court, unless it is shown that the property is exempt from seizure.
From these statutes, the contempt at issue in this proceeding is for the benefit of J & P for the execution of its judgment and not to vindicate the authority of the court. The contempt was a constructive contempt in that it occurred outside the immediate presence of the court and required proof of Norris' possession of the money which was not on his person in the courtroom. La. C.C.P. arts. 222 and 224. The turnover order and the resulting contempt punishment pursuant to La. R.S. 13:3862 represent actions for civil contempt to coerce performance by imposing an indefinite sentence for that which was within Norris' power to perform. We have found no Louisiana jurisprudence interpreting La. R.S. 13:3862, nor dealing with such a turnover order, the burden of proof, and the court's measure and distinguishment of the civil versus criminal law implications of such proceedings. Accordingly, we have turned to federal law and jurisprudence concerning such turnover proceedings utilized in the bankruptcy courts. 11 U.S.C. § 542 (1979); Oriel v. Russell, 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419 (1929); Maggio, 333 U.S. at 56-78, 68 S.Ct. 401.
The jurisprudentially-developed summary turnover proceeding enabled the federal bankruptcy courts to retrieve concealed and diverted assets or secreted books of account the withholding of which would intolerably obstruct and delay administration of the bankrupt's estate. Maggio, 333 U.S. at 63, 68 S.Ct. 401. The turnover was required to be supported by clear and convincing evidence of the existence of the property or its proceeds and *349 possession thereof by the defendant at the time of the turnover order. Maggio, 333 U.S. at 63, 68 S.Ct. 401; Oriel, 278 U.S. at 364, 49 S.Ct. 173.[2] This proof has been referred to as the "present possession" rule.
After the 1979 inclusion of a turnover process in the Bankruptcy Code, which does not expressly address contempt, the turnover order nevertheless remained enforceable by civil contempt proceedings. 11 U.S.C. § 542 (1979); In re Lawrence, 251 B.R. at 630; In re Norris, 192 B.R. at 863. In a civil contempt proceeding, the party seeking the contempt has the initial burden of proving by clear and convincing evidence that the respondent violated a court order. Commodity Futures Trading Com'n v. Wellington Precious Metals, Inc., 950 F.2d 1525, (11th Cir.1992), cert. denied, 506 U.S. 819, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992). When a summary turnover order is enforced through a contempt proceeding, the court is prohibited from inquiring into the justification for the turnover order itself at the contempt proceeding. However, the contemnor is allowed to present evidence of a "present inability" to comply with the order that goes beyond a mere assertion of inability. This is because at both the turnover proceedings and the contempt proceedings, the question of possession and ability to produce the goods is at issue, but quite possibly at different points in time. Indeed, when the trustee institutes a later contempt proceeding, he tenders the issue of present wilful disobedience to the court and opens inquiry into nonpossession at the later time. Maggio, 333 U.S. at 74-75, 68 S.Ct. 401. In raising this defense, however, the contemnor has the burden of proof. Rylander, 460 U.S. at 757, 103 S.Ct. 1548; In re Lawrence, 251 B.R. at 651. When the contemnor makes a clear showing of inability to comply with the order, then, imprisonment cannot continue. In re Lawrence, 251 B.R. at 651; In re Norris, 192 B.R. at 863. In such summary proceedings, the contemnor can deny his present possession or give any evidence of present conditions or intervening events which corroborates him; the credibility of his denial is weighed in light of his present circumstances. If he offers no evidence of his present inability to comply, or stands mute, he fails to meet his burden. Nor can he succeed in his burden by his own denials which the court finds incredible in context. His denial of possession is given credit after demonstration that a period in prison did not produce the goods. Maggio, 333 U.S. at 75-76, 68 S.Ct. 401.

Discussion
Before examining the trial court's reconsideration of its 1994 contempt judgment, we will review the issue of the burden of proof necessary for contempt in this property turnover setting. From the United States Supreme Court precedents, the majority of the federal courts still employ the higher standard of proof by clear and convincing evidence instead of a mere preponderance standard. Since we find that such standard has a constitutional implication for the measure of this civil proceeding with near criminal punishment, we agree that such burden of proof applies.
*350 In the early ruling in Oriel, the court applied the clear and convincing evidence standard for the turnover order. One reason given for the choice was because the establishment of a case for turnover was considered the equivalent of fraud, which required such higher standard of proof in a court of equity. Nevertheless, the court also listed as a justification for the higher burden of proof the following:
The proceeding is one in which coercive methods by imprisonment are probable and are foreshadowed.
278 U.S. at 363, 49 S.Ct. 173. While the proceeding is civil, leading possibly to only civil contempt, weaker proof allowing for a competing possibility of the debtor's inability to perform may lead to imprisonment that is actually criminal punishment for an indefinite duration. In other settings, the United States Supreme Court has held that civil proceedings implicating an individual's right to freedom requires that the burden of proof be higher than the mere preponderance of the evidence. Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).
The two factual issues that are critical for the turnover proceeding are (i) the past existence of the property or money in the debtor's possession and (ii) the fact that it is "yet within the power" of the debtor to produce the property to the court. These facts are somewhat interdependent. In fact, if present possession in the courtroom is shown at a judgment debtor examination or other similar proceeding, the two facts would merge as one and the court could order the immediate seizure of the property. Nevertheless, there is a critical element of time and other circumstances that can produce opposite conclusions concerning these two factors.
The first factual element was proven in the December 1994 proceedings by Norris' admission that he withdrew from his safety deposit box 4,900 one-hundred-dollar bills approximately two months before the hearing. This fact was firmly established by direct evidence.
The second and most critical factthe present ability to complyinherently rests on circumstantial evidence. Given the relatively short time period and the extremely large amount of money, which is non-perishable property, the evidence gave rise to the strong inference that the money was still in Norris' possession. This proof was strengthened by his feeble and unsubstantiated assertion that he had spent the money before the December proceedings. Finally, the fact that J & P's large judgment was just then becoming exigible indicated that Norris was attempting to place the property beyond his creditor's reach.
The proof of these two facts on December 8, 1994, and Norris' disobedience twenty-four hours later, justified the trial court's ruling on December 16 to hold Norris in contempt and to employ the civil, coercive remedy of sentencing him to jail until he produced the money. Employment of that indefinite sentence, however, was not the end of the matter. The conclusion in 1994 that the contempt process for the testing of Norris' wilful disobedience could commence with imprisonment did not mean that the strongly established inference of his ability to produce the money at that time could never be reconsidered. The cited jurisprudence above reveals that the courts can be called upon after a lengthy imprisonment of the contemnor to test whether the civil remedy has become more punitive than coercive, thereby defeating the purpose of the imprisonment, or violating due process. Indeed, the trial court recognized the need for reconsideration in this case. Nevertheless, the trial court expressed a mistaken *351 view that it was bound to enforce the 1994 ruling, despite its doubts, as though the sentence was an unfulfilled criminal punishment. Accordingly, under the unique circumstances of this case, we remand the case for the trial court's complete review of the matter to determine whether a civil contempt sentence remains coercive in view of the facts which have occurred since 1994 and any further evidence presented by either party.
Norris has presented evidence of his long federal imprisonment which occurred for essentially the same coercive purpose. In Maggio, the leading United States Supreme Court case on this subject, there is dicta indicating that if "a period in prison does not produce the goods," the inference of the contemnor's ability to comply weakens and "he will not be held in jail forever." 333 U.S. at 76, 68 S.Ct. 401. Additionally, the long passage of time, almost ten years, indicates that the entire $500,000 to prevent imprisonment may no longer be a realistic "key" in Norris' hand for release from jail. In Maggio, because of a significant delay between the initial turnover order and the lower court's contempt ruling, the high court remanded the case for full consideration of the evidence of the contemnor's lifestyle during the two-year period between the entry of the turnover order and finding of contempt. Similarly, like the lower courts in Maggio, the trial court in this case is not bound by the strong inference of Norris' possession in 1994 of the $500,000 if other factors discredit that inference over time.
Finally, we note that the creditor's use of the contempt power under La. R.S. 13:3862 involving the cost of state imprisonment is not the only coercive means of execution of a Louisiana judgment. There is evidence in the record that J & P has continued to exercise repeated judgment debtor examinations of Norris, and wage garnishment proceedings have apparently begun. When faced with conflict over whether civil contempt has lost its coercive power and strayed into the strictures of criminal law, the trial court is not without other resources to aid the creditor in the execution of a judgment debt.
Regarding the effect of the bankruptcy proceedings, we find that res judicata does not apply nor that J & P, as a creditor, is precluded from seeking this relief. Norris does not assert that a stay from the bankruptcy court continues to affect these proceedings. J & P's efforts for execution upon its judgment are continuing proceedings which turn on developing facts regarding Norris' assets and his ability to comply. The remand which we now order allows for consideration of new and different facts which have evolved because of the passage of time. Therefore, the thing to now be adjudicated in this proceeding can hardly be said to be identical to that which was adjudicated in December 1994, or thereafter in the bankruptcy court.

Conclusion
Because this issue of civil contempt for the creditor's benefit under La. R.S. 13:3862 is res nova in Louisiana and subject to important constitutional constraints, we believe that justice requires a remand of this matter for further proceedings consistent with the foregoing examination of the law. Costs of appeal are assessed to applicant.
REMANDED FOR FURTHER PROCEEDINGS.
NOTES
[1] These proceedings were precipitated by Norris' failure to appear for a scheduled deposition. The parties had also been in court on December 7, 1994, for these motions. The trial court continued the motions until the following day and ordered Norris to present himself to plaintiff's lawyer for the giving of his deposition immediately after the December 7 hearing.
[2] A minority of courts have recently questioned whether the clear and convincing standard remains viable in the context of the turnover proceeding. See, In re Santaella, 298 B.R. 793 (Bankr.S.D.Fla.2002); In re U.S.A. Diversified Products, Inc., 193 B.R. 868 (Bankr.N.D.Ind. 1995). Nevertheless, courts continue to apply the clear and convincing standard. In re Lawrence, 251 B.R. 630 (Bankr.S.D.Fla.2000); In re Morris, 192 B.R. at 863.