457 So.2d 321 (1984)
Marion Lee Powers PEYTON, Plaintiff-Appellee,
v.
Stephan Michael PEYTON, Defendant-Appellant.
No. 16433-CA.
Court of Appeal of Louisiana, Second Circuit.
September 26, 1984.
*322 C. Joseph Roberts, III, West Monroe, for defendant-appellant.
Sadye K. Bernheim, Monroe, for plaintiff-appellee.
Before HALL, MARVIN and NORRIS, JJ.
HALL, Judge.
In this case the district court rendered a joint custody award providing that the parents of a four-year-old girl would share her custody in alternating three-month intervals. The father appeals, questioning whether the award was correct in light of the court's finding that the mother was engaged in discreet lesbian activities. The father also questions several other aspects of the decision, including the propriety of the three-month custody intervals, and the correctness of a statement of the court concerning the credibility of witnesses. We affirm the judgment of the district court.
The Factual Setting
Stephan and Lee Peyton, father and mother of the minor child, physically separated in April of 1982, although at the time of trial they resided across the street from each other. The child, Alexa, initially lived with her mother. On April 30, 1982, while the child was visiting with her father, the father filed for legal separation and for custody. He obtained temporary custody by an ex parte order. After one year of living separate and apart, the mother filed for divorce on that ground, and sought joint custody of her daughter. The father reconvened, seeking divorce on the grounds of adultery, and seeking sole custody of the child. The basis of the father's action was the alleged homosexual activity of the mother. The mother then amended her pleadings, seeking sole custody on the basis of an alleged adulterous relationship of the father.
At trial, Mr. Peyton admitted to a sexual relationship with his girlfriend, Robin Daniels, but denied allegations that Alexa was ever present when sexual relations occurred. On the other hand, Mrs. Peyton denied allegations that she was homosexual, and denied that she had sexual relations with her roommate, Jennifer Greenwood. Mrs. Peyton and Ms. Greenwood shared a three-bedroom house, and initially shared a bed before another bed was acquired. While both women denied ever sleeping in the nude during this time, Patricia P. Meriwether, a licensed psychiatric social worker who interviewed Alexa prior to trial, testified that Alexa related an incident in which she was allowed in bed with her mother and Ms. Greenwood when both women were nude. In Mrs. Meriwether's opinion, a child's sleeping with a nude parent was not a good practice because of possible over stimulation of the child. She further testified that despite Alexa's experiencing the trauma of her parents' separation, Alexa showed no significant signs of disturbance, and thus was not recommended for therapy. Mrs. Meriwether found that Alexa had a good relationship with both parents, although she saw the environment at her mother's home as more permissive. This testimony was based on one two-hour interview conducted a week before trial. Other testimony at trial concerned the quality of the parenting provided by the parties, and the nature of the sexual relationships *323 allegedly engaged in by the parties.
The trial judge found that while the mother was in all probability engaged in discreet lesbian activities, the father was less than candid concerning his extramarital relationship, generally impairing the father's credibility as well as that of his witnesses. Noting the applicability of La. Civil Code Article 146 as amended by Act 695 of 1983, the judge found that all eleven factors enumerated in Article 146 pointed toward an award of joint custody. Furthermore, he expressed his feeling that the active participation of both parents in the daughter's life was essential to her development, security, and sense of well-being. Thus, judgment was rendered granting the parents primary physical custody of Alexa in alternating three-month periods. During each period the parent not having primary custody was to have visitation rights on alternate weekends. The judge noted, however, that his plan would need modification when Alexa reached school age. The judgment was signed on December 21, 1983, and this appeal followed on January 4, 1984. Later that same month the Peytons' divorce became final.
Issues Presented
Appellant contends the three-month custody intervals ordered by the Court are disruptive and not in the child's best interest. We disagree. Considering that the mother and father live across the street from each other, and that the child enjoys her own furnished room in each residence, moves between households could hardly be less disruptive. Any disruptive effect associated with the different environment found in each parent's home must be balanced against the beneficial effect of decreasing the spans of time during which the child has contact primarily with only one parent, especially when dealing with such a young child in whom changes and development are occurring at such a rapid rate. We further note that a frequent and continuing relationship with both parents is the primary aim of the joint custody provisions of Article 146. Peters v. Peters, 449 So.2d 1372, (La.App.2d Cir.1984). Thus, we find no abuse of the trial court's discretion in ordering three-month intervals of primary custody, and we refuse to interfere with the court's plan. "Appellate courts should be very reluctant to interfere with plans ordered by trial courts in the exercise of their discretion after careful consideration, and should do so only where a clear abuse of discretion is demonstrated." Peters, supra.
Appellant also contends the trial court erred in stating that appellant's lack of candidness concerning his extramarital relationship generally impaired his credibility and that of his witnesses. Appellant presumes the court did not believe his testimony or that of Ms. Daniels when they denied their extramarital affair took place in Alexa's presence. We find the court's statement concerning impaired credibility, taken in context, did not extend beyond the matter of whether the child was present in the father's residence when the father and Ms. Daniels spent the night together. As will be discussed later, we also find that even had the trial court believed testimony that the child was not present, an order of joint custody would not have been improper. Therefore, further discussion of appellant's contention is not essential to this custody determination. We note, however, that one important factor underlying the trial court's broad discretion in child custody cases is the trial court's better opportunity to evaluate witnesses. Sherman v. Sherman, 441 So.2d 469 (La.App.2d Cir. 1983). A logical inference is that the court's discretion is particularly great in evaluating witness credibility. Certainly we cannot say that this discretion was abused regarding the credibility of appellant and Ms. Daniels, when the record contains the testimony of several witnesses that in April of 1983 Alexa, her father, and Ms. Daniels all spent the night at the father's residence.
The remainder of appellant's contentions concern the trial court's application of Article 146 to the facts of this case, especially in light of the court's finding that the *324 mother was engaged in discreet lesbian activities. Article 146 provides that custody shall be awarded according to the best interests of the child, and establishes a rebuttable presumption that joint custody is in the child's best interest. Eleven factors are given for consideration when determining whether the presumption has been rebutted. As noted, the trial court found all eleven factors pointed toward an award of joint custody. Appellant concedes that several of those factors do not advance an argument for rebuttal of the presumption. In particular, appellant concedes that both parties love the child, and that the child loves both her parents; that both parties have the capacity and disposition to provide the child with food, clothing, medical care, and other material needs; that both parents apparently are in good physical health; that home, school, and community records have not really been established due to the child's age; that the child has not been called upon to express a preference; and that the distance between the parties' residences is not a factor for consideration. The eleventh factor of Article 146 can consist of any factor, not covered by the preceding ten, that the court considers relevant. We find no considerations in this case not covered adequately by the first ten factors. Therefore, elimination of the last factor of Article 146 in addition to elimination of those conceded not applicable by appellant, leaves approximately half of the enumerated factors available for rebutting the presumption favoring joint custody.
Of the remaining factors called into question by appellant, moral fitness is clearly the most relevant. While appellant argues that the mother's alleged homosexuality casts doubt on her ability and willingness to provide proper guidance, and to provide a stable environment resembling a family unit, these arguments clearly stem from an argument against the mother's moral fitness. The factors listed in Article 147 do not stand as isolated considerations with no potential for overlap. Rather, the unique facts of each custody case will often present a circumstance touching upon an intersectional area, and thus calling more than one factor into consideration. In the present case, all appellant's remaining arguments may be resolved by deciding the question of the parties' moral fitness.
Neither parent in this case has demonstrated high moral standards. The father admitted an adulterous relationship with his girlfriend, while the mother was found to be engaged in discreet lesbian activities. In his custody award, the trial judge did not see fit to favor one form of adultery over another; we do not find his decision erroneous.
A parent's lack of moral fitness can rebut the presumption favoring joint custody when the evidence shows that the parent's moral values and behavior are detrimental to the child's interests. In Nale v. Nale, 409 So.2d 1299 (La.App.2d Cir.1982), this court recognized several factors involved in determining whether a parent's sexual lifestyle was damaging to the child:
1. Is the child aware of the illicit relationship?
2. Has sex play occurred in the presence of the child?
3. Was the sexual misconduct notorious, bringing embarrassment to the child?
4. What effect has this conduct had on the family home life?
Here, the trial judge found the mother's activities to be discreet, and we are satisfied that the father's activities were, for the most part, discreet as well. The parents' shielding of the child from their illicit activities and the child's tender years have helped prevent an awareness of her parents' relationships. Certainly, the record does not indicate that sex play ever occurred in the child's presence. Similarly, the parents' discretion apparently has prevented their sexual misconduct from becoming notorious. Finally, the parents' conduct has not had any apparent adverse effect on the family home life in either of their homes. Thus, the four factors listed above do not indicate the moral unfitness of either parent to have custody of the *325 child. An evaluation of the moral fitness of the parties does not indicate an award of joint custody to be against the child's best interests.
In making the above determination, we are not unaware of the seriousness of the implication of Ms. Meriwether's testimony, despite the fact that she was testifying to an event as related by a very young child during a single interview initiated at the appellant's request. The event in question, however, appears to be an isolated one, and the mother and Ms. Greenwood did not continue to share a bed. Furthermore, although the mother and Ms. Greenwood are still roommates, the presumptions society makes when an unmarried man and woman share living quarters do not apply in situations where members of the same sex are roommates. While the child may suffer from the opprobrium of society when living in the same house with her mother and the mother's homosexual lover, such is not the case unless the relationship is notorious. Such does not appear to be the case, at least presently, in the situation at hand.
Finally, we note that each child custody case "deals with a peculiar parental relationship which will exist prospectively, and then only as long as the circumstances in the relationship do not change in the future". Tabor v. Tabor, 421 So.2d 1185 (La.App.2d Cir.1982). Here, the trial court has recognized the need for a change in the existing custody plan when Alexa reaches school age. At the time of this opinion, Alexa is five years old, and her enrollment in school is fast approaching. When the trial court fashions a new plan, the judge will be able to evaluate how well the child has adapted to the original plan, since both parents have already gone through at least one period of primary custody. The judge will also have a chance to further evaluate the relationships of the parents, and any possible detrimental effects the relationships may have on Alexa. These upcoming chances for further evaluation not only illustrate the differences in trial and appellate court functions, but also illustrate another reason for the great deference that should be given to the trial court's decisions in custody cases.
In accordance with the reasons given above, the award of joint custody as ordered by the trial court is affirmed at appellant's cost.
Affirmed.