**Deborah M. WEST, Appellant,**

v.

**Mark E. LAWSON, Appellee.**

No. S–8083.

Supreme Court of Alaska.

Jan. 16, 1998.

---

4. AS 20.10.020 and AS 20.10.040 are former versions of current AS 25.23.040 and AS 25.23.050, respectively.

Vincent Vitale, Anchorage, for Appellant.

Mark E. Lawson, pro se, Las Vegas, NV, Appellee.

Before MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE and BRYNER, JJ.

### OPINION

FABE, Justice.

## I. INTRODUCTION

This appeal involves a dispute between Deborah West and Mark Lawson over the custody of their three-year-old daughter, Shelby. West and Lawson entered into a custody agreement under which Shelby was to live with each parent fifty percent of the time. Lawson then moved to Las Vegas, Nevada. Following a modification hearing, the superior court imposed a custody schedule under which Shelby would spend alternate six-month periods with West in Anchor-

age and with Lawson in Las Vegas until she reached school age. We vacate the six-month alternating custody schedule and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

West and Lawson met in November 1992 and began dating several months later. They lived together briefly, but were no longer living together when Shelby was born in January 1994. The parties were never married and have no other children.[1] Shelby was diagnosed with mild cerebral palsy in 1995.

After Shelby's birth, the parties attempted reconciliation and Shelby lived with both parties in Lawson's mother's Anchorage apartment until October 1994 when West moved out. Shelby then lived with Lawson for five days each week in his mother's apartment and with West for two days each week during West's days off from work. West visited Shelby regularly at Lawson's mother's apartment.[2]

In June 1995 West filed a complaint for custody. Lawson filed an answer and counterclaim seeking sole custody. In February 1996 West and Lawson entered into a custody agreement under which Shelby was to live with each parent fifty percent of the time. Although the agreement did not establish a specific visitation schedule for Shelby's pre-school years, Shelby lived approximately half of the week with each parent from February 1996 to November 1996. The agreement specified that once Shelby began kindergarten she would live with each parent on an alternating week basis.

In November 1996 Lawson and his wife moved to Las Vegas in pursuit of employment opportunities. Recognizing that his move would make it impossible to continue the alternating half-week custody schedule, Lawson moved for an alternating six-month custody schedule. The motion was denied. West moved for a determination of whether Lawson's move warranted modification of the custody agreement. The motion was granted.

A modification hearing was held in March 1997. The court heard testimony from several witnesses including both parties, the child custody investigator, Allen Bailey, and a psychologist, Dr. Karen Henderson–Dixon, called by West as an expert witness. Bailey recommended that West have primary physical custody and that Lawson have visitation rights. Dr. Henderson–Dixon wrote a report and testified about the detrimental effects of an alternating six-month custody schedule on a child Shelby's age. She recommended against such a schedule, but because she had not met with Shelby or her parents and was unfamiliar with details of the case, she expressed no opinion regarding which party should be granted custody.

Despite these recommendations, the court explained that it "weigh[ed] pretty heavily the negotiated agreement" between the parties, and that it "[found] nothing in this record that does not suggest that the carefully formulated agreement that the parties arrived at regarding custody in this case is not in the best interests of this child." The court adopted the custody agreement's stipulation that Shelby live with each parent fifty percent of the time. It modified this provision by imposing an alternating six-month custody schedule. Neither at the hearing nor in its final custody order did the court indicate what the custody schedule would be when Shelby begins kindergarten.

The custody agreement also provided that Lawson would make payments into a joint bank account to repay West for Social Security benefits he had received on Shelby's behalf. The agreement further provided that Lawson's failure to make the payments would entitle West to obtain judgment for the balance then outstanding, attorney's fees, and prejudgment and postjudgment interest. Although Lawson failed to make the payments, the court's final order required Lawson to repay only the balance then outstanding and postjudgment interest.

West appeals the lower court's imposition of the alternating six-month custody schedule and the court's failure to award attorney's

---

1. Lawson married Melissa Parker in July 1996.

2. Lawson claims that West's visits were sporadic until March 1995.

fees associated with obtaining judgment for the outstanding balance and prejudgment interest.

## III. DISCUSSION

### A. Standard of Review

■ Modifications of custody decisions are reviewed for abuse of discretion. *See Kessler v. Kessler,* 827 P.2d 1119, 1119 (Alaska 1992). Abuse of discretion may be established when "in reaching its decision, the trial court considers improper factors, fails to consider statutorily mandated factors, or gives too much weight to some factors." *Id.* "In the context of a custody modification decree, this analysis must be applied to assess whether the superior court was justified in changing the previous custody determination." *Gratrix v. Gratrix,* 652 P.2d 76, 80 (Alaska 1982). A trial court's factual findings are reversed only if they are clearly erroneous. *See Horutz v. Horutz,* 560 P.2d 397, 399 (Alaska 1977). "A finding is clearly erroneous if it leaves this court with 'a definite and firm conviction on the entire record that a mistake has been made.'" *City of Hydaburg v. Hydaburg Co-op. Ass'n,* 858 P.2d 1131, 1135 (Alaska 1993) (quoting *Parker v. Northern Mixing Co.,* 756 P.2d 881, 891 n. 23 (Alaska 1988)).

### B. The Custody Schedule

■ A child custody or visitation award "may be modified if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child." AS 25.20.110(a); *see also A.H. v. W.P.,* 896 P.2d 240, 244 (Alaska 1995). When a court determines the best interests of a child in the context of changed circumstances, "the scope of judicial inquiry is limited to facts directly affecting the child's well-being." *S.N.E. v.*

*R.L.B.,* 699 P.2d 875, 878 (Alaska 1985) (citing AS 25.24.150(d)).

■ Because Lawson's move to Las Vegas constituted a change of circumstances, the superior court's analysis at the hearing should have focused on whether alternating custody would be in Shelby's best interests in light of the changed circumstances. *See House v. House,* 779 P.2d 1204, 1207–08 (Alaska 1989). However, the record indicates that in determining Shelby's best interests, the court placed undue weight on the existing custody agreement. Although the court did consider the best interests of the child, its findings suggest that its modification determination was substantially influenced by the agreement's provision that the parties share physical custody equally.

■ Reliance on the agreement was unwarranted because the visitation provision, which established that physical custody would be shared equally, was based on the assumption that both parties would live in Anchorage.[3] Moreover, the evidence in this case does not support a conclusion that the alternating six-month custody schedule is in Shelby's best interests.

We addressed the issue of an alternating six-month custody schedule where one parent intended to live outside of Alaska in *Kelly v. Kelly,* 926 P.2d 1168 (Alaska 1996). We observed that divided physical custody cases typically involve parents who reside in the same community, and that awards of divided physical custody where parents live in different parts of the country "may foreclose 'a stable environment and the development of permanent associations....'" *Id.* at 1169 (quoting John P. McCahey et al., 2 *Child Custody and Visitation Law and Practice* § 13.04(2) (1993)). Although we considered the case close, we upheld the alternating six-month schedule because "[n]o evidence was

---

3. Lawson argues that the agreement contemplated that either party might live outside of Alaska, and points to a single sentence in the agreement that states that "the parties shall equally divide transportation expenses" if they "are living in different cities or states." We reject this argument. The transportation expenses provision notwithstanding, the agreement's visitation provision is based on the assumption that both parties will live in Anchorage. It includes, for ex-

ample, an alternating week custody schedule once Shelby reaches school age, and a limitation on the amount of time each parent can take Shelby outside of Anchorage. These provisions make sense only in the context of both parties living in Anchorage. Thus, the provision of the custody agreement upon which the superior court principally relied is the provision most affected by the change of circumstances.

presented that the arrangement was likely to prove harmful to [the child]." *Id.*[4]

In this case, by contrast, evidence was presented that an alternating six-month custody schedule is likely to prove harmful to a three-year-old child such as Shelby. Most notably, Dr. Henderson–Dixon submitted a report in which she traced the three stages of a preschool child's emotional and psychological development and highlighted the critical nature of "stability and consistency of caregiver and surroundings" for a three- or four-year-old child.[5] She explained that "[i]t is not in a preschool child's best interest to have major environmental change," and that while a preschool child ideally needs to be emotionally connected to both parents, she "primarily needs a consistent and stable environment with one parent and frequent contact with the other." She further emphasized the detrimental effects of an alternating six-month custody schedule:

> While a 6 month on/6 month off visitation schedule may be doable for parents, it does not satisfy the emotional needs of the preschool child and is, in fact, destructive to the child.

In her testimony at the modification hearing, Dr. Henderson–Dixon stressed that an alternating six-month custody schedule "is a very bad arrangement" and would be "debilitating" to a child Shelby's age, and that "for a child that age, they are severely handicapped in their development and it will affect them for the rest of their lives." In a memorandum to the lower court, West also presented evidence about the harmful effects of an alternating six-month custody schedule, citing literature from the field of child psychology that cautions against extended visits away from home for three-year-olds.[6]

The evidence presented by West is consistent with the prevailing view in the field of child psychology that alternating physical custody schedules can undermine stability in children's lives. *See* McCahey, *supra,* § 13.04(2) ("Although courts have awarded alternating custody in appropriate cases,[ ] divided custody is generally disapproved."); Jeff Atkinson, 1 *Modern Child Custody Practice* § 6.06, at 361 (1986) ("Alternating custody is controversial because, more than other custodial arrangements, it carries the potential for creating disruption in the child's life."); *see also* Joseph Goldstein et al., *Beyond the Best Interests of the Child* 32–34 (rev. ed.1979) (emphasizing the importance of continuity of care and stability for infants, toddlers and young children).

In accordance with this view, a number of courts have disfavored alternating physical custody arrangements as unduly disruptive to a child's life. *See Wilking v. Reiford,* 582 So.2d 717, 719 (Fla.Dist.Ct.App.1991) (holding rotating custody presumptively not in a child's best interests); *Heard v. Heard,* 353 N.W.2d 157, 162 (Minn.Ct.App.1984) (holding annual rotation of custody not in a child's best interests absent extraordinary circumstances); *Fisher v. Fisher,* 370 Pa.Super. 87, 535 A.2d 1163, 1166 (1988) (holding alternating year physical custody not in a child's best interests where parents lived in different states).

Where both parents reside in the same community, however, we have affirmed the use of an alternating week physical custody arrangement as a "thoughtful and sensitive approach to a difficult problem." *Deininger v. Deininger,* 835 P.2d 449, 451 (Alaska 1992). Other courts likewise approve of alternating physical custody arrangements where parents live in the same community, and emphasize the importance of minimizing the disruption of a child's life. *See Peyton v. Peyton,* 457 So.2d 321, 323 (La.Ct.App.1984) (affirming alternating three-month custody schedule where parents lived across the

---

**4.** We observed in a footnote that *Kelly* was "an inappropriate case in which to decide whether to adopt a general presumption disfavoring divided custody when the parents do not reside in the same community." *Kelly,* 926 P.2d at 1169 n. 2.

**5.** Because Dr. Henderson–Dixon never met with Shelby or her parents and acknowledged that she knew "none of the details of this child's development," her report and testimony addressed the general developmental dangers of an alternating six-month custody plan for a child Shelby's age.

**6.** *See* William F. Hodges, *Interventions for Children of Divorce* 170 (1986) ("Children of this age [three years old] should not be required to travel to a distant geographic location for an extensive visit with the noncustodial parent.").

street from each other); *In re Marriage of Ryan*, 222 Mont. 188, 720 P.2d 691, 693 (1986) (affirming alternating week custody schedule where parents lived in same community and where, if either parent moved out of the area, parent remaining in the area would have physical custody during the school year); *Beck v. Beck*, 86 N.J. 480, 432 A.2d 63, 72 (1981) (recognizing that "geographic proximity of the two homes is an important factor" in awarding joint physical custody); *Lapp v. Lapp*, 293 N.W.2d 121, 129 (N.D.1980) (affirming alternating six-month custody schedule where the court noted there would be "no substantial disruption" for the child because both parents "are of close geographical proximity"). In such instances, where disruption can be minimized and continuity of care maintained, alternating physical custody may be in a child's best interests.

Consistent with the views of experts in the field and other courts, we have expressed a strong preference for preserving stability in children's lives. *See, e.g., S.N.E. v. R.L.B.*, 699 P.2d 875, 878 (Alaska 1985) ("[W]e have repeatedly stated our concern with maintaining continuity of care and avoiding disturbing and upsetting the child with repeated custody changes.") (citing *Gratrix v. Gratrix*, 652 P.2d 76, 81 (Alaska 1982)); *Morel v. Morel*, 647 P.2d 605, 608 (Alaska 1982) ("We have continually stressed the desirability of maintaining continuity of care.").

This concern is echoed in the "[f]actors for consideration in awarding shared child custody" contained in AS 25.20.090. In promulgating this statute, the legislature recognized the importance of maintaining stability in a child's life in the context of shared custody arrangements, requiring that

> [i]n determining whether to award shared custody of a child the court shall consider
>
> . . . .
>
> (5) the advantages of keeping the child in the community where the child presently resides;

> (6) the optimal time for the child to spend with each parent considering
>
> (A) the actual time spent with each parent;
>
> (B) the proximity of each parent to the other and to the school in which the child is enrolled;
>
> (C) the feasibility of travel between the parents; . . .

AS 25.20.090.

Despite the concerns reflected in AS 25.20.090, Dr. Henderson–Dixon's opinion that an alternating six-month custody schedule would be "destructive" and "debilitating," and the prevailing view that alternating physical custody is disfavored in cases such as this, the superior court found that an alternating six-month custody schedule would be in Shelby's best interests. The court concluded that Dr. Henderson–Dixon's testimony was too general in nature to aid in the determination of Shelby's best interests:

> I have some concern about and don't find very helpful the testimony of Dr. Henderson–Dixon, primarily because what she gave the court was standard treatise, textbook average child. She's never seen the child. She did not indicate that she had looked at any medical records or anything else about the child and I don't find her testimony to be very helpful in trying to decide what in—are in the best interests of this child.

The court made no other findings about the evidence of the potential harmful effects on Shelby of an alternating six-month custody schedule. More particularly, the court did not point to any evidence indicating that Shelby had less need for stability than a "textbook average child."

Furthermore, neither the court's oral findings nor its written custody decree addressed the factors enumerated in AS 25.20.090. First, although the court recognized the issue of proximity, it failed to discuss it.[7] *See* AS 25.20.090(6)(B). Because the proximity of each parent to the other is at the heart of

---

[7]. The court observed that "[t]here is also, I think, a—the fact that these parents now live several thousand miles apart and that is in fact the heart of the issue, so we come back to the question of stability." The court then proceeded to discuss the stability of West's and Lawson's households. It did not discuss, however, the potential effects of the geographical distance between the parties on the stability of Shelby's life. Nowhere else did the court address the question of proximity.

this case, such an omission is error. Second, although the court raised the issue of travel to determine how to distribute travel expenses between the parties, it failed to consider the feasibility of travel. *See* AS 25.20.090(6)(C). Finally, the court failed to address any advantages of keeping Shelby in Anchorage, the community in which she resided at the time of the hearing. *See* AS 25.20.090(5).

 We conclude that the superior court erred by giving undue weight to the custody agreement, failing to give adequate weight to the evidence presented by West, and failing to consider the relevant factors in AS 25.20.090. Where one parent has moved to a distant locale, we hold that a six-month alternating physical custody arrangement disrupts the stability of a young child's life and thus is not in the child's best interests absent compelling evidence to the contrary. In this case, the record indicates that no such compelling evidence exists.

### C. *Attorney's Fees*

West argues that she is entitled to attorney's fees and prejudgment interest associated with her enforcement of a financial provision of the custody agreement. Lawson fails to address the issue.

The custody agreement provided that Lawson would make payments into a joint bank account as a means of reimbursing West for one-half of the Social Security benefits he had received on Shelby's behalf and had not shared with West. The agreement further provided that Lawson's failure to make the payments would entitle West, on behalf of Shelby, "to obtain a judgment for the balance then outstanding, plus attorney's fees and prejudgment and post-judgment interest at the maximum lawful rate of interest." Lawson failed to make the payments. The court's final custody order required Lawson to repay the balance and post-judgment interest to West. It did not, however, award attorney's fees associated with obtaining judgment or prejudgment interest to

West. On remand, the superior court should determine the amount of attorney's fees and prejudgment interest due.

### IV. *CONCLUSION*

We VACATE the lower court's final custody order and REMAND for a determination of custody and attorney's fees and prejudgment interest consistent with this opinion.[8]

**J.W., Appellant,**

v.

**R.J., Appellee.**

**No. S–7827.**

Supreme Court of Alaska.

Jan. 16, 1998.

---

8. We note that the superior court's final custody order established a custody schedule to be in effect only "until the child is of public school age." On remand, the superior court should either determine a custody schedule for when Shelby begins kindergarten or establish a mechanism for resolving the issue at a later date.