951 So.2d 448 (2007)
Karen Leaper WINSTON, Plaintiff-Respondent
v.
Ronald David WINSTON, Defendant-Applicant.
No. 41,766-CW.
Court of Appeal of Louisiana, Second Circuit.
January 24, 2007.
*449 Jacqueline Scott, Bossier City, for Applicant.
Ronald J. Miciotto, Shreveport, for Respondent.
Before STEWART, CARAWAY and MOORE, JJ.
MOORE, J.
Ronald Winston seeks supervisory review of a judgment holding him in direct contempt of court and sentencing him to 90 days in jail. We grant the writ, vacate the contempt judgment and remand the case for further proceedings.

Procedural Background
After a period of marital strife and litigation, Karen Winston obtained a protective order[1] against her husband Ronald in December 2005, and filed the instant petition for Art. 102 divorce on May 30, 2006. The district court signed a proposed order restraining Ronald and all persons acting on his behalf from "disposing of, alienating or mortgaging any of the property belonging to the community of acquets and gains[,]" but crossed out a portion regarding harassment and abuse, as the § 2131 order was already on file. At a hearing on July 17, the court awarded Karen the use of the family home on Medallion Circle in the Longwood area of Shreveport, and of the couple's vehicle, a Cadillac Escalade. The court later stated that Ronald had consented to this action; however, this hearing is not transcribed and the minutes show that Ronald appeared without counsel.
One week later, on Karen's motion, the court fixed an August 14 hearing to address "all remaining pending issues, including those regarding interim and thereafter permanent spousal support[.]" Because the issue on review is direct contempt under La. C.C.P. art. 221, we will focus sharply on the events of this hearing.
Ronald appeared with counsel, Ms. Scott, who apparently thought the purpose of the rule was to fix periodic support. Karen's counsel, Mr. Miciotto, however, had a broader agenda. Karen and Ronald both worked at GM, making about $26 an hour; Karen learned that Ronald had accepted the "early buyout" plan and received about $140,000 in incentive pay. She also learned that after turning over the couple's Escalade, Ronald had bought another Escalade (albeit an older model) and was spending a lot of money, including trips to "the boats." In essence, she and Mr. Miciotto wanted Ronald to account for the $140,000, which they considered community property.
The district court took a rather confrontational approach to Ronald, noting that he had failed to produce documents pertaining to the buyout plan and that these parties were "regular litigators." Before Mr. Miciotto could present any evidence, the court swore in Ronald and began questioning him.[2] Ronald's responses were evasive and contradictory. At first he said he had received $92,700 in the buyout, but he could not spend it until the "checks *450 clear." The court advised him to produce every document pertaining to the buyout by 4:00 PM or else face contempt. Ronald then testified that he had no money to pay for anything; his buyout was "on hold" because he had bought the Escalade. The court replied that it would issue an injunction prohibiting him from spending any more buyout cash. Ms. Scott repeatedly objected that the disposition of the buyout proceeds was not the purpose of the rule, but the court overruled her.
Ronald then admitted that he took his buyout, with a pretax value of $140,000, two weeks earlier, but none of it was left. He admitted spending $35,000 on the new Escalade, paying numerous bills, and repaying loans to family members, but mostly he just "splurged it away." He accounted for about $40,000 of the buyout. Then, on direct examination by Ms. Scott, he admitted still having some $9,000 to $10,000 left, which he had "put up" with his sister in Minden. At various points, he testified that he had no bank account, that he had a checking account, that the cash was in his sister's bank account, that he had placed it in a friend's credit union account, and that he could produce about $10,000 "when the court wants." Mr. Miciotto asked the court to hold him in contempt for perjury.
Over Ms. Scott's objection, the court phoned the friend, Sylvia Young, and purported to swear her in over the phone.[3] Ms. Young confirmed that Ronald had deposited $32,000 into her credit union account in late July, but that only $12,000 of this was left; she also stated that Ronald's sister was holding about $10,000 for him. Ronald then testified that these two funds were the "same money."
The court then stated that it had also phoned Ronald's sister, Mrs. Williams, and that this lady denied receiving from Ronald any more than about $1,000. This conversation is not transcribed.
Suddenly, the court told Ronald to place the keys to the Escalade on the table and tell the bailiff where it was parked. The court then ordered Ronald immediately incarcerated "on a direct contempt of me for repeatedly and deliberately misstating and misrepresenting facts" under La. C.C.P. art. 222(1), actions which it considered "contumacious disrespect" for the court. Ms. Scott objected, urging that Ronald admitted lying to the court but had corrected his testimony "when you got serious."
At a hearing on August 16, the court sentenced Ronald to 90 days in jail, with credit for time served. The balance was suspended, subject to the condition that if "you deliberately misrepresent anything, if you willfully and deliberately fail to obtain, provide and produce documents," the full 90 days would be imposed without benefits.
Ronald took the instant writ application, which this court granted and referred to the docket.

Discussion
Direct contempt of court is governed by La. C.C.P. art. 222, which provides:
A direct contempt of court is one committed in the immediate view and presence of the court and of which it has personal knowledge, or a contumacious failure to comply with a subpoena or summons, proof of service of which appears of record.

*451 Any of the following acts constitutes a direct contempt of court:
(1) Contumacious, insolent, or disorderly behavior toward the judge, or an attorney or other officer of the court, tending to interrupt or interfered with the business of the court, or to impair its dignity or respect for its authority;
(2) Breach of the peace, boisterous conduct, or violent disturbance tending to interrupt or interfere with the business of the court, or to impair its dignity or respect for its authority;
(3) Use of insulting, abusive, or discourteous language by an attorney or other person in open court, or in a pleading, brief, or other document filed with the court in irrelevant criticism of another attorney or of a judge or other officer of the court;
(4) Violation of a rule of the court adopted to maintain order and decorum in the court room;
(5) Contumacious failure to comply with a subpoena, proof of service of which appears of record, or refusal to take the oath or affirmation as a witness, or refusal of a witness to answer a non-incriminating question when ordered to do so by the court; and
(6) Contumacious failure to attend court to serve as a juror after being accepted as such, or to attend court as a member of a jury venire, when proof of service of the summons appears of record.
Proceedings for contempt are strictly construed; the law does not favor extending their scope. In re Merritt, 391 So.2d 440 (La.1980); Davis v. Harmony House Nursing Home, 35,080 (La.App. 2 Cir. 10/31/01), 800 So.2d 92, writ denied, XXXX-XXXX (La.2/22/02), 810 So.2d 1143. Contempt proceedings are designed to vindicate the dignity of the court rather than to benefit a particular litigant. Davis v. Harmony House, supra.
The district court cited Art. 222(1) and stated that the contumacious behavior was "repeatedly and deliberately misstating and misrepresenting facts." The interplay between perjury and direct contempt has not been often explored in our jurisprudence, but in State ex rel. Terence v. Lazarus, 37 La. Ann. 314 (1885), a litigant was held in direct contempt, fined and sentenced to 35 days in prison on grounds that "he did answer the questions put to him by the counsel and the court, but that he did not answer them truthfully." On writ application, the supreme court vacated the contempt judgment:
Refusing to answer a question that a witness is bound to answer is contumacy and is punishable as a contempt. Answering such question untruthfully is perjury, the punishment of which is remitted to the regular action of the criminal law through the established forms of criminal proceedings, i.e. by indictment or information followed by a trial. * * *
The law gives to every judge the power to punish for contempt. It is necessary for the orderly police of the court, but to decide that the testimony of a witness is false and to inflict summary punishment upon him without a trial is repugnant to the orderly administration of justice and subversive of our ideas of right.
The court observed that in cases of flagrant perjury, judges "not infrequently" direct the attention of the prosecuting officer to the man and his offence, even ordering his committal until the criminal process could be set in motion for trial. It was error, however, when the district court "dispensed with any form of trial, determined the guilt of the offender without accuser or witness, and summarily punished him without an opportunity of defense." Id.
*452 We find that the court's action herein is perfectly analogous to the action condemned in State ex rel. Terence v. Lazarus, supra. The court is not allowed to make a finding of perjury without affording the witness the usual due process protections of the criminal justice system. Although Ronald's testimony at the August 14 hearing was evasive and apparently contradictory, and we can understand the court's frustration, it simply does not warrant a summary finding of perjury and imposition of direct contempt under Art. 221. The contempt judgment will be vacated.
We have also examined the record to determine whether any other ground of direct contempt under Art. 221 might apply. Ronald's conduct, though far from exemplary, was neither insolent nor disorderly, and never approached a breach of the peace, boisterousness or violent disturbance; only the judge's own peremptory and somewhat heavy-handed actions threatened the dignity of the proceedings. On this record, we cannot affirm a finding of direct contempt.
Finally, we note that a witness's conduct in giving "allegedly false testimony" is not normally grounds for constructive contempt under Art. 224(4). Miller v. Miller, XXXX-XXXX (La.App. 3 Cir. 10/31/01), 799 So.2d 753. Under the circumstances, some grounds of constructive contempt may be present in this case. However, any such finding, with the prospect of unconditional jail time, must be predicated on finding that the contemnor violated a court order intentionally, knowingly, purposely and without justifiable excuse. Arrington v. Arrington, 41,012 (La. App. 2 Cir.4/26/06), 930 So.2d 1068, and citations therein. To the extent that it could result in criminal penalties, it must be accompanied by all the protections that the constitution requires in criminal proceedings. Johnson & Placke v. Norris, 38,300 (La.App. 2 Cir. 5/12/04), 874 So.2d 340, writ denied, XXXX-XXXX (La.9/24/04), 882 So.2d 1137. The case will be remanded for further proceedings.

Conclusion
For the reasons expressed, we grant this writ and vacate the contempt judgment. The case is remanded for further proceedings. Costs of this application are not assessed. La. C.C.P. art. 2164.
WRIT GRANTED; CONTEMPT JUDGMENT VACATED; CASE REMANDED.
CARAWAY, J., concurs in the result.
NOTES
[1] Karen filed a standard-form petition for a protective order pursuant to La. R.S. 46:2133 C.
[2] This court has previously admonished the same district court for its unorthodox practice of calling, swearing and extensively examining witnesses sua sponte. Coffman v. Coffman, 40,992 (La.App. 2 Cir. 4/12/06), 926 So.2d 809. We reiterate those remarks here, as the instant hearing followed essentially the same irregular pattern.
[3] This court is aware of the authority of an administrative law judge, with the consent of the parties, to conduct "adjudications or conferences" by telephone and administer oaths in such proceedings. La. R.S. 49:994 D. However, we find it disturbing that the district court resorted to the same level of informality in a hearing on a rule, over the objection of counsel and with no prior notice to the witness.