965 So.2d 630 (2007)
Christi Lynn Fowler COOK, Plaintiff-Appellant
v.
Porter Alan COOK, Defendant-Appellee.
No. 42,587-CA.
Court of Appeal of Louisiana, Second Circuit.
September 19, 2007.
*632 Susan D. Scott, Shreveport, for Appellant.
Stewart & Stewart, by Jonathan M. Stewart, for Appellee.
Before WILLIAMS, STEWART, CARAWAY, PEATROSS and MOORE, JJ.
MOORE, J.
The mother, Christi Cook, appeals a judgment that modified a prior stipulated joint custody implementation plan ("JCIP") for the custody of her four children by designating their father, Porter Cook, as the domiciliary parent, and found her in contempt of court for violating a specific provision of the JCIP. For the reasons expressed, we reverse in part, affirm in part, and render.

Factual and Procedural Background
Christi and Porter were married in 1987; they lived in Ringgold, Louisiana, and had four children: Haylee, born in 1990, Aubree in 1994, Abram in 1998 and Jered in 2000. They separated in early 2001 and Christi filed for an Art. 102 divorce. By consent, they entered a JCIP that provided 50-50 sharing of the children, two weeks with each parent alternatively. The crux of the case, then and now, was Christi's lesbian relationship with a 19-year old woman, Shannon Maloney. The JCIP included a provision referred to at trial as "the Shannon clause":
Neither parent shall allow Shannon Maloney to be associated with the minor children and thereby not allowing her to live or visit in the home at 2961 Highway 4, Ringgold, Louisiana.
When they divided the community property in March 2002, Porter received the house and Christi moved out. In July 2003, Porter filed a petition to modify the JCIP because Christi had moved to Caddo Parish. He also alleged that Christi had allowed Shannon to "freely associate" with the children, even to live in the house with them; on this basis he moved to hold her in contempt of court. The rule was continued several times and in March 2004 the court appointed James Fullilove, a mental health counselor in Shreveport, to examine the parties and the children. His report recommended that the children should live primarily with Christi if she got a larger house (she was by then living in a trailer park near Ringgold).
The hearing on Porter's motions was set for June 17, 2004; however, after a pretrial conference the parties entered a stipulated judgment in which Christi admitted she had violated the JCIP by allowing Shannon to visit her while the children were there. The court imposed a six-month sentence, suspended on the condition that Christi pay various court costs, relocate to "at or near Coushatta" within 90 days or else return to Bienville Parish, and fully comply with the JCIP.[1] Christi *633 refused to sign this judgment, although her attorney at the time (not current counsel) approved it as to form.
In April 2005, Porter filed the instant motion to hold Christi in contempt for refusing to sign the judgment and for violating the Shannon clause. He enumerated 18 incidents with Shannon and asked to be named the domiciliary parent, subject to supervised visitation on alternating weekends at Christi's parents' house. Christi responded with her own motion to modify custody. She asked the court to revoke the Shannon clause and to make her the primary domiciliary parent. The motions were set for April 12, 2006.
On the first day of trial, Christi admitted on cross-examination that she was romantically involved with Shannon (who was by then 24 years old); during the two-week intervals when the children were with Porter, Shannon would stay with her at the trailer. At other times, Shannon lived in the trailer next door. Christi described her plan to find a larger place to live, but admitted this could be financially difficult as long as she was giving Shannon transportation to and from her job at the Roadhouse Grill in Shreveport. Christi insisted that since the June 2004 stipulated judgment, Shannon had never been at the trailer while the kids were present.
Christi also denied each of the violations that Porter had alleged, most of which involved the children's athletic events. Even when they were staying with Porter, Christi attended their basketball and softball games (there was also a church fair); Shannon, who is described as athletic in build, often accompanied her. The couple never sat with or next to Christi's children, but on certain occasions one of them would approach Christi to talk, thus coming within close proximity to Shannon. On one occasion, Shannon was videotaping Haylee's basketball game and stood in the exit as the team filed through.
Mr. Fullilove, the mental health counselor, reiterated that the children have a good life with Christi, but noted that Porter's house was four times larger than her trailer. Digressing from the text of his original report, Mr. Fullilove opined that the best custody plan would be for the children to stay at Porter's house and the parents take turns living there; he admitted he had never seen this happen. He sharply criticized Christi for seeing "nothing wrong with co-parenting with Shannon," and warned that the children would suffer greatly if brought up in a homosexual environment. This view was informed by his belief that a lesbian partner would distort the children's (especially the girls') perception of female role models.
Surprised by the new direction of the expert testimony, Christi asked for a continuance. She secured her own expert, Dr. Sally Thigpen, a psychologist from Ruston, Louisiana. Dr. Thigpen wrote a 35-page report detailing her MMPI assessments of Christi, Porter and the children, as well as her critique of Mr. Fullilove's report.
When the trial resumed on June 12, Dr. Thigpen roundly disagreed with Mr. Fullilove's assessment of "the Shannon situation." She testified that there was no reliable clinical evidence showing that children raised by lesbian couples were more likely to grow up lesbian or to have more psychological problems than the general population. She admitted, however, that the situation had been unfavorable in that Christi had instructed the children not to tell Porter that Shannon was living next *634 door. Dr. Thigpen reiterated that Christi was the more capable and involved parent.
Porter's pastor, Gary Hahler, admitted that Christi took the children to Springhill Baptist Church more often than Porter did, but he fervently disapproved of homosexuality as a sin, as well as exposing children to it. Although he never personally observed Christi and Shannon engaged in any immoral conduct, he recalled that three unnamed church members had voiced displeasure over Christi's lifestyle. Because of this, Christi's volunteer position as a preschool VBS teacher "may change."
Porter testified that as he understood the JCIP, Shannon was not supposed to be present at any school games or anywhere near the children; he felt that Christi had repeatedly violated the spirit of the Shannon clause. He opined that homosexuality is a choice and a sin, that kids raised by lesbian parents are more likely to grow up lesbian, and he disagreed with Dr. Thigpen's professional opinion to the contrary. He requested primary domiciliary custody, allowing Christi all the supervised visitation she wanted. On cross-examination, he carefully recalled each of Christi's infractions of the Shannon clause, admitting that on no occasion did Shannon approach the children or speak to them.
Shannon testified that although she lived next door to Christi for several years, she had recently (May 2006) gotten her own place in Bossier City. She was adamant that since the stipulated judgment holding Christi in contempt, she had never been at Christi's trailer or in her car when the children were present. She promised that she would always comply with the judgment. She denied any public displays of affection with Christi in public places, and expressed her view that a gay couple could raise kids just as well as a straight one.
On direct examination, Christi again disputed, one by one, each alleged violation of the Shannon clause. She admitted that Shannon had been present at various ball-games but denied she associated with the children. She stated that she wants to maintain her relationship with Shannon but also comply with the judgment. The court extensively questioned Christi, suggesting its view that she was not sufficiently discreet with Shannon and had harmed the children by telling them to conceal from their father the facts about the relationship.

Action of the District Court
By written opinion, the court cited the best-interest factors of La. C.C. art. 134 and summarized the evidence as to each. The court rejected Christi and Shannon's testimony that they had honored the Shannon clause, noting that in the prior proceedings, Christi had admitted letting Shannon associate with the children and deceiving the court about where Shannon lived. The court found it "extremely hard" to believe that while Shannon was living next door she had no contact with the children. Further, being subjected to an openly lesbian relationship "could very well be destructive emotionally" for the children since it would place them in conflict with "the ordinary morays [sic] of society." Purportedly on the strength of Mr. Fullilove's and Dr. Thigpen's testimony, the court found that Christi and Shannon simply could not be discreet in their relationship. The court accepted Rev. Hahler's testimony that the lifestyle violated Baptist standards; he found the children needed "stable predictable living in a conflict free environment" which Porter was better able to provide. It therefore named Porter the primary domiciliary parent.
In a final paragraph, the court found Christi in contempt:

*635 [F]or violating the previous orders of this court as to the `no Shannon rule' in that the court feels that she did violate the order by allowing Ms. Maloney to place a trailer next to hers and then deceiving not only her ex-husband but also trying to deceive the court in her testimony[.]
The court sentenced her to six months, suspended, and two years' supervised probation.
Christi has appealed, raising three assignments of error, challenging both the change of custody and the finding of contempt. Porter replies that the judgment should be affirmed in its entirety.

Modification of Custody
By her first assignment of error, Christi urges the district court erred in modifying the existing JCIP without finding a change in circumstances materially affecting the children's welfare and that the proposed change would be in the children's best interest. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731. Aside from the fact that she moved back to Bienville Parish in 2004, nothing else in anybody's situation has materially changed. As to Art. 134(6), she contends that the "limited jurisprudence concerning homosexuality and moral fitness" holds that just because a parent is gay does not make him or her unfit; this happens only if the relationship adversely affects the child. Scott v. Scott, 95-0816 (La.App. 1 Cir. 12/15/95), 665 So.2d 760, writ denied, 96-0181 (La.2/2/96), 666 So.2d 1106. She also cites Peyton v. Peyton, 457 So.2d 321 (La.App. 2 Cir.1984), for guidelines regarding the effect of an illicit sexual relationship upon parental fitness. She concludes that even though the court's factual findings are protected by manifest error, there is no evidence that the relationship with Shannon has harmed the children.
Porter responds that Christi's continued violation of the JCIP in allowing Shannon to associate with the children was a change in circumstances warranting the change in custody. He submits that Christi and Shannon's testimony denying any violations of the JCIP was self-serving and not worthy of belief, in light of their documented efforts to mislead him and the court. He disputes Christi's reliance on Scott v. Scott and Peyton v. Peyton, supra, as in those cases the children were truly unaware of their mothers' lesbian liaisons, and such is simply not the case here. Finally, he argues the district court was not plainly wrong to find that the plan naming him the primary domiciliary parent was in the children's better interest than the JCIP with its 50-50 split.
The JCIP, as well as the June 2004 judgment on rules, were stipulated judgments. The party seeking to modify such a judgment must prove (1) that there has been a material change of circumstances since the original custody decree was entered, and (2) that the proposed modification is in the best interest of the child. Evans v. Lungrin, supra; Ketchum v. Ketchum, 39,082 (La.App. 2 Cir. 9/1/04), 882 So.2d 631. On close examination, we are constrained to hold that the district court's written reasons contain no finding of (indeed, not even a passing reference to) the first essential element, a material change of circumstances. This is legal error requiring us to review the evidence de novo. Evans v. Lungrin, supra.
This record overwhelmingly shows that the circumstances affecting the children and parents are unchanged before and after the JCIP and 2004 stipulated judgment. Christi has her same job as a teacher at Ringgold Elementary; Porter has his same job as a radiation therapist at Schumpert Medical Center (since 2002, he has worked additional weekends at a hospital *636 in Coushatta). When Porter has the children, Christi's mother looks after them on school afternoons until Porter gets home from work. The children still attend Riverdale Academy in East Point; when they are with Porter, they still frequently phone Christi for help with their school work. The children, especially Haylee and Aubree, are greatly involved in team sports at school; before and after the JCIP, Christi has attended virtually all their games, and Porter as many as his schedule would permit. Both parents continue taking the children to Springhill Baptist Church. The children have, of course, grown older; at the time of trial, Haylee had just gotten her driver's license and a cell phone. In short, we have searched in vain for any change materially affecting the welfare of these children.
Porter asserts that Christi's "continued violation" of the JCIP constituted a material change of circumstances, but on de novo review we find precious little record evidence to support this. Porter testified that he thought the Shannon rule meant she could not be present at any of the children's games or near them at any time. However, in both the JCIP and the June 2004 judgment, the Shannon rule states that neither parent shall allow Shannon "to be associated with the minor children." A violation must be premised on the text of the court order, not one party's interpretation of it. Smith v. Smith, 35,378 (La.App. 2 Cir. 9/26/01), 796 So.2d 726. The record shows that Shannon attended several ball-games with Christi but turned aside if the children approached Christi to talk; this indicates a studied effort to avoid associating with them. On de novo review, we cannot find that these incidents constituted a material change of circumstances.
Porter also contends that Christi violated the JCIP by allowing Shannon to move next door; given her close proximity, Christi must have allowed her to visit while the children were there, thus violating the letter of the Shannon clause. We will not dispute the district court's assessment of the women's credibility, but must observe that there is no positive evidence to support the conclusion that violations occurred. No witness confirmed seeing Shannon at Christi's trailer with the children, and notably, neither Dr. Thigpen nor Mr. Fullilove uncovered any such incidents despite their extensive interviews with the children. Although we would share the district court's reservations about Christi and Shannon's credibility, this record will not support a finding that repeated violations occurred.
Without sufficient evidence of the first essential element of Evans v. Lungrin, supra, the modification must be reversed and any consideration of the second element, whether the proposed change is in the best interest of the children, would appear to be redundant. We would note, however, that the district court found many of the best-interest factors of La. C.C. art. 134 evenly balanced between the parties. Porter could provide a larger house and outside activities, but that Christi "was more responsible for the care and rearing of the children than [Porter] for many reasons." In short, the current situation of the JCIP is eminently in the children's best interest. The court was mainly concerned that as they became aware of their mother's lesbian relationship, they would be embarrassed by the "socially unacceptable situation" and conflicted in their Baptist faith. The record, however, contains not one scintilla of evidence that the children have been embarrassed or treated badly by their peers on account of their mother's relationship. As for the pastor's testimony, this shows only by hearsay that certain unnamed church members felt that Christi should not be teaching VBS. It does not *637 establish that anybody has ostracized the children because of the mother's state of "sin," and we are reluctant to ascribe such rank prejudice to Rev. Hahler's parishioners.
Christi's first assignment of error has merit. The judgment modifying the JCIP is reversed, and the prior judgment is reinstated.

The Shannon Clause
By her second assignment of error, Christi urges the district court erred in refusing to remove the Shannon clause or at least refine it such that the proscribed conduct is clearly defined. Restrictions on a parent's custody or visitation should not be imposed except in unusual circumstances. Cronier v. Cronier, 540 So.2d 1160 (La.App. 3 Cir.1989). Christi submits that in the absence of evidence that Shannon was a drug abuser or a criminal, had ever harmed the children or would be a bad influence on them, there was no reason for this clause except to penalize Christi by thwarting the relationship and giving Porter leverage in custody matters.
Porter responds that Christi agreed to the Shannon clause during the pretrial conference leading to the stipulated judgment, so she knew precisely what conduct it prohibited.
Porter's position has merit. "A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made the confession." La. C.C. art. 1853. A stipulated judgment or consent decree governing child custody and support is deemed a judicial confession. State v. Blankenship, 41,107 (La.App. 2 Cir. 6/28/06), 935 So.2d 793, writ denied, 2006-2293 (La.11/22/06), 942 So.2d 561, cert. denied, ___ U.S. ___, 127 S.Ct. 2135, 167 L.Ed.2d 869 (2007); Dronet v. Dronet, 96-982 (La.App. 5 Cir. 4/9/97), 694 So.2d 426, writ not cons., 97-1263 (La.9/5/97), 699 So.2d 82. The record is abundantly clear that both in the JCIP and in the stipulated judgment of June 2004, Christi agreed to this provision. It may be revoked only for error of fact, La. C.C. art. 1853, and such has not been shown. Moreover, any stipulated judgment of custody may be modified upon a showing of the dual criteria of Evans v. Lungrin, supra, but for the reasons already discussed we find insufficient proof of a material change of circumstances.
This assignment of error lacks merit.

Contempt Order
By her third assignment of error, Christi urges the district court erred in holding her in contempt. She contends that the grounds cited by the court, willful disobedience of any lawful judgment and deceit or abuse of process, are acts of constructive contempt, La. C.C.P. art. 224(2), (4), but the statutory process for punishing such contempt, La. C.C.P. art. 225 A, was simply not followed. She adds that the Shannon clause is too vague to support a finding that she violated it "intentionally, knowingly and purposefully, without justifiable excuse." Smith v. Smith, supra. Finally, she contends she did not receive the due process protections of criminal law. Midyett v. Midyett, 32,208 (La.App. 2 Cir. 9/22/99), 744 So.2d 669.
Porter responds that Christi's attempt to mislead Mr. Fullilove "could constitute direct contempt under C.C.P. art. 222(1)." In Porter's view, the Shannon clause was not vague and Christi's infractions were therefore intentional.
Contempt may be civil or criminal. Civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, *638 and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard; neither a jury trial nor proof beyond a reasonable doubt is required. Johnson & Placke v. Norris, 38,300 (La.App. 2 Cir. 5/12/04), 874 So.2d 340, writ denied, XXXX-XXXX (La.9/24/04), 882 So.2d 1137, and citations therein.
By contrast, a contempt sanction is criminal if the sentence is punitive, to vindicate the authority of the court. "A fixed sentence of imprisonment is punitive and criminal if it is imposed retrospectively for a completed act of disobedience such that the contemnor cannot avoid or abbreviate the confinement through later compliance  the defendant is furnished no key and he cannot shorten his term by promising not to repeat the offense." Id., at p. 9, 874 So.2d at 346. Criminal penalties may not be imposed on someone who has not been afforded the protections that the constitution requires of such criminal proceedings. Hicks v. Feiock, 485 U.S. 624, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988). These protections include proof beyond a reasonable doubt. International Union, United Mine Workers v. Bagwell, 512 U.S. 821, 826, 114 S.Ct. 2552, 2557, 129 L.Ed.2d 642 (1994); Johnson & Placke v. Norris, supra. The instant judgment imposes jail time (albeit suspended) for past, completed conduct, and appears to be intended to vindicate the authority of the court. We therefore view it as a criminal sanction.
A direct contempt of court is one committed "in the immediate view and presence of the court and of which it has personal knowledge, or a contumacious failure to comply with a subpoena or summons, proof of service of which appears of record." La. C.C.P. art. 222.
The district court held Christi in contempt, in part, for "deceiving not only her ex-husband but also trying to deceive the court in her testimony[.]" However, the court is not allowed to make a finding of contempt based on perjury "without affording the witness the usual due process protections of the criminal justice system." Winston v. Winston, 41,766, p. 6 (La.App. 2 Cir. 1/24/07), 951 So.2d 448, at 452. As in Winston, we find that Christi's evasiveness and reluctant testimony do not satisfy the constitutional burden of proof beyond a reasonable doubt that she committed perjury. Thus there was no basis for finding her in direct contempt of court and ordering her "punished therefor by the court forthwith." La. C.C.P. art. 223.
The court also held Christi in contempt, in part, for her past violation of the Shannon rule "by allowing Ms. Maloney to place a trailer next to hers[.]" Contrary to Christi's assertion, Porter filed a motion for contempt on April 1, 2005, listing 18 alleged infractions, an order issued, and Christi obviously received service, as she later filed a motion to fix the matter for hearing. On this record, she received adequate notice of the contempt rule as required by La. C.C.P. art. 225 A.
However, the court's finding was not based on the 18 incidents in which Shannon allegedly came into close contact with the children at sporting events and church fairs. It was instead based on the fact that Shannon was living next door. For the reasons already expressed, this fact alone does not prove beyond a reasonable doubt that she allowed Shannon to associate with the children. As noted, both Christi and Shannon denied it; no other witness saw it; and the experts, who spent a great deal of time with the children, did not establish that Shannon had associated with them since the June 2004 stipulated judgment. Without more, the circumstantial evidence that Shannon lived next door is simply not sufficient to prove a violation beyond a reasonable doubt. The judgment of contempt will be reversed.

*639 Conclusion

For the reasons expressed, the judgment is reversed insofar as it modified the joint custody implementation plan by making Porter the primary custodial parent; judgment is rendered reinstating the provisions of the JCIP. The judgment is also reversed insofar as it found Christi in contempt of court. However, the judgment is affirmed insofar as it retained the Shannon rule. Trial and appellate costs are to be paid one-half by Porter and one-half by Christi.
REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.
STEWART, J., dissents with written reasons.
CARAWAY, J., concurs in part and dissents in part with written reasons.
STEWART, J., dissenting.
For the following reasons, I respectfully dissent from the majority's reversal of the trial court's modification of custody.
Contrary to the majority's opinion that there is no material change in circumstances as required to modify a stipulated custody judgment, the trial court's thorough, considered reasons point to Ms. Cook's continual failure to abide by the "no Shannon rule" as the material change supporting modification of custody.
Ms. Cook agreed to the rule in 2001, as part of the stipulated 50/50 custodial arrangement. The trial court concluded that Ms. Cook failed to abide by the agreed-upon rule and disbelieved her testimony and that of Shannon Maloney about the discretion they exercise in the conduct of their relationship. The trial court also discounted their testimony claiming the children were shielded from association with Shannon even though she lived next door to Ms. Cook and attended many of the children's school events with their mother. The language of the "no Shannon rule" could have been more explicit in setting forth what was specifically prohibited, but common sense dictates that Shannon's presence at school events is an association with the children regardless of whether she turns away while Ms. Cook speaks with any of them. While the majority finds "precious little record evidence" in support of the contention that Ms. Cook violated the rule, the trial court's credibility determinations, findings, and conclusions in that regard are supported by the record and should not be cast aside by the majority in favor of their own interpretation of the evidence.
The trial court also determined that modification of custody would be in the children's best interest. The record supports this determination. Based on expert testimony and the past actions of Ms. Cook, the trial court found that she would not be discreet in her relationship with Shannon and that this would be likely to adversely affect the children. Moreover, Shannon would not be a beneficial influence in their lives. The trial court believed that Mr. Cook was in the best position to foster a close relationship between the children and their mother, particularly since Ms. Cook had hidden from him the fact of Shannon living next door to her for two years. Also significant was the trial court's consideration of the parties' respective residences. Mr. Cook resides in the former family home where there is adequate room for all four children. Ms. Cook resides in a two bedroom trailer where she shares her room with the two youngest boys. These factors as well as the other considerations made by the trial court show modification to be in the children's best interests.
The trial court did not abuse its discretion in naming Mr. Cook the primary domiciliary *640 parent. Under La. C.C. art. 134, the court is instructed to consider all relevant factors in determining the best interests of the children. In addition to the factors mentioned above, the court rightfully considered the values of both the community and the children's religion in making the best interest determination. The children's pastor, Gary Hahler testified that the relationship between Ms. Cook and Shannon is a well-known fact among church members, the parents at the children's school, and in the community of Ringgold. It is a subject of discussion. Some church members had commented on it, and he had heard some derogatory remarks made at a school function. Hahler's daughter, who is a good friend of one of the Cook children, had learned of the relationship on her own. While Ms. Cook's expert, Dr. Sally Thigpen, suggested that a discreet homosexual relationship would not be harmful to the children, the evidence established that Ms. Cook is not involved in a discreet relationship. Rather, it is open and well-known in the community in which the children reside.
The fact that Ms. Cook is involved in a lesbian relationship is not the dispositive factor. Rather, it is the conduct and effects of the paramour relationship on the parent's fitness for custody and the impact on the children's best interests that are determinative. Ms. Cook's deceptions and continued involvement with her paramour in the presence of the children, e.g., by attending school functions with Shannon in tow, maintaining neighboring abodes where Shannon is often at Ms. Cook's trailer and lives there at times, and involving the children in concealing her living arrangements from their father, show her efforts and intent to have Shannon associated and involved in the children's lives contrary to what she agreed to with their father. Her testimony regarding the discretion she exercises in her relationship with Shannon in the children's presence is simply unbelievable. It cannot be said that Ms. Cook has abided by the "no Shannon rule" or will do so in the future. It should also be noted that the relationship is what broke up the Cook family. The adverse impacts this relationship has had and will likely have on the children, in light of the social mores of their town, should not be discounted.
Though the trial court modified the judgment to make Mr. Cook the primary domiciliary parent under a joint custody arrangement, the judgment recognizes Ms. Cook's close relationship with the children and affords her ample time, including any additional time worked out with Mr. Cook, to be with the children.
The trial court's determinations in child custody matters are entitled to great weight, and the court's discretion will not be disturbed on review in the absence of a clear showing of abuse of that discretion. AEB v. JBE, 99-2668 (La.11/30/99), 752 So.2d 756; Seamster v. Nelson, 40,510 (La. App.2d Cir.10/26/05), 914 So.2d 1124. I find that no abuse of discretion has been shown and would affirm the trial court's modification of custody.
CARAWAY, J., concurring in part and dissenting in part.
I concur with the majority in the reversal of the trial court's modification of custody, but respectfully dissent regarding the reversal of the contempt ruling. I likewise agree with all members of the court that the so-called Shannon clause need not be excised from the judgment of custody.
In Peyton v. Peyton, 457 So.2d 321 (La. App. 2d Cir.1984), this court discussed the issue of a parent's moral fitness in a custody dispute where the mother was found to be engaged in a discreet lesbian relationship. *641 The opinion, by then judge and later Justice Pike Hall, first cited the principle, still applicable under Civil Code Article 134(6), that "a parent's lack of moral fitness can rebut the presumption favoring joint custody when the evidence shows that the parent's moral values and behavior are detrimental to the child's interests." Id. at 324. The court then listed the factors involved in determining whether a parent's sexual lifestyle is damaging to a child, as follows:
1. Is the child aware of the illicit relationship?
2. Has sex play occurred in the presence of the child?
3. Was the sexual misconduct notorious, bringing embarrassment to the child?
4. What effect has this conduct had on the family home life?
Id.
The Peyton ruling is this court's legal perspective in a custody setting of the measure of a parent's sexual lifestyle. The joint custody of these children was first stipulated by these parents six years ago with the Peyton constraints applicable to the mother's lesbian relationship. The Shannon clause of the initial consent judgment did not require the end of the lesbian relationship. The father does not ask this court or any court for sole custody or supervised visitation of the mother with the children because of the lesbian relationship. The trial court's joint custody judgment which is the subject of this appeal still affords the mother 120 days of unsupervised custody of the children during each year despite the ongoing lesbian relationship. Therefore, not only was there no material change in circumstances shown to have occurred, allowing the trial court's slight alteration of the existing joint custody, the trial court's new joint custody order does not alter, or in any manner attempt to end, the perceived material problem to the children's welfare from the lesbian relationship.
The test for the father's proof of the alleged material change of circumstances in this case should be, in my opinion, the same four-factor test from Peyton listed above. He did not show any harm to the children's welfare under those factors. The trial court's ruling did not rest on those factors. Most significantly, the father did not request the court to consider the testimony of the oldest child who, at sixteen years of age, might reveal to the trial court in chambers any problems pertaining to the Peyton factors associated with her mother's prior years of custody.
Regarding the trial court's contempt ruling against the mother, I respectfully disagree with the majority ruling and would allow the contempt judgment against her to stand. The mother's deceit and abuse of process before the court was contemptible. The majority's conclusion that a criminal punishment or jail time was imposed by the suspended sentence is incorrect. "Jail time (albeit suspended)" is not jail time. With the keys to imprisonment still in the mother's hands based upon her future conduct, she only received a civil, coercive punishment making this purely a matter of civil contempt.
NOTES
[1] The decree also stated that if Christi should violate the Shannon clause, "there shall be a change of custody and Porter Alan Cook shall be designated as the primary domiciliary parent[.]" This court reversed the "automatic non-judicial change" provision. Cook v. Cook, 40,572 (La.App. 2 Cir. 1/25/06), 920 So.2d 981.